ARGUED AND DETERMINED

IN THE

# SUPREME JUDICIAL COURT

OF

# MASSACHUSETTS.

---

DELIA M. MANGAN *vs.* FRED B. HOWARD & another, executors.

Plymouth. January 17, 1921. — March 3, 1921.

Present: RUGG, C. J., BRALEY, CROSBY, & PIERCE, JJ.

*Gift, Inter vivos, Of registered municipal bond.*

A delivery of a registered municipal bond, without any indorsement or instrument of assignment or transfer, by the registered owner, a woman, to another woman to whom the owner intended to transfer absolute title to the bond as a gift, and an acceptance of the bond as such a gift by the donee, who retained it until the death of the owner three years and ten months later, constitute a valid gift *inter vivos* which cannot be avoided by the personal representative of the donor after her death, although the donor stated that it was her purpose to have the interest on the bond herself "to run the house [which a year before she also had conveyed to the donee, reserving to herself the right to its use and enjoyment during her life] and do repairs, painting and paper hanging" and the checks for the interest always were sent to the donor at the house where she and the donee lived together on intimate terms, were indorsed by her, delivered and cashed by the donee and the money was paid over to the donor in accordance with the donee's "usual practice."

BILL IN EQUITY, filed in the Superior Court on July 14, 1919, seeking to establish title in the plaintiff to two $20,000 registered bonds of the city of Boston, alleged to have been delivered to the plaintiff as a gift *inter vivos* by Martha J. Brett, the defendants' testatrix, three years and ten months before her death.

The parties agreed to a stipulation in substance that the bonds which were the subject of the suit should remain in the custody of the defendants at the Home National Bank in Brockton, unassigned and unincumbered as to principal and interest, except that the proceeds of either of them upon maturity might be received by the defendants and placed on deposit with the bank.

The suit was referred to a master. Parts of the master's findings were in substance as follows:

"After the death of the mother of Mrs. Brett in 1886, a marked change appears in the relations between her and the plaintiff, who, theretofore, had been doing the housework for Mrs. Brett. The plaintiff became more of a companion than a helper. She now did all the cooking and continued this up to the death of Mr. Brett. The drudgery of the heavy housework was transferred to others and the washing was sent out. After Mr. Brett's death in 1892 the relation became still closer. They were together practically all the time with a fondness and affection, each for the other, the extent and warmth of which was properly described in the bill as 'closely akin to the relationship of parent and child.' The evidence of this love and devotion comes not alone from the plaintiff, but from relatives and friends of both parties. The unanimous testimony of a large number of witnesses shows a constancy of affection, wonderful in its strength and simplicity. From no source is there a discordant note. Its existence is not disputed or seriously questioned. A report somewhat in detail on the phase of the case seems essential as a setting for subsequent events. Deceased often addressed plaintiff as 'Darling Delia;' 'You will never leave me Delia,' was a common expression to the plaintiff; 'You have given your life for me, you would have a nice home and family only for me,' was said to the plaintiff in the presence of witnesses. Referring to the plaintiff, deceased has made use of these expressions; 'I love Delia,' 'I could not live without her,' 'She is the only friend that will do anything for me,' 'She is the only one I love,' 'Delia has sacrificed her whole life and she will be well repaid,' 'She will always have a home and money enough to run the house,' 'She has looked out for me and I shall for her.' 'All happiness has come into my life through her.' After the deceased had given the plaintiff a deed of the homestead in 1914 as reported later, and after the alleged gift

of the bonds in 1915 and on the second Sunday before her death she said, 'I have given the house to Delia and have provided for her to live comfortable.' These statements were also made referring to the plaintiff; 'She has seen me through faithfully.' 'She is the best friend I ever had.' 'She has nursed me night and day.' 'I have given her the house and means to keep it.' 'I wanted things fixed so she would have everything I ever had.' It was a common occurrence for the deceased to throw her arms about the plaintiff and kiss her, using endearing terms and avowals of love, exacting promises that she would never leave her. Whenever the deceased was tired and nervous she always found relief in the caress of the plaintiff. No other person was able thus to minister to her on these occasions. These demonstrations of affection with a request that she would return soon frequently occurred when the plaintiff would leave the house for a walk or to do an errand. For twenty-five years before her death the deceased never left home for pleasure, riding, visiting friends, or shopping without the companionship of the plaintiff. Starting together for church on Sundays they would separate only to attend their respective place of worship — plaintiff to the Catholic Church, and the deceased to the Unitarian. They occupied adjoining sleeping rooms on the second floor of the house, the beds being so placed that the occupants could see each other after retiring. Upon occasions in their earlier life the deceased did not like to sleep alone, and for a period of fifteen or sixteen years they slept together most of the time, and for the last twelve years, all of the time, alternating between the two rooms. They were thus together on the night when the deceased passed away. Upon that night the plaintiff ministered to her when she complained of not feeling as well as usual, and requested that she might call a doctor. The deceased did not care for medical attendance, but insisted that the plaintiff should not leave her, and her last words addressed to the plaintiff were, 'You are right there.' She died in the plaintiff's arms. . . .

"On March 31, 1914, the deceased executed and delivered to the plaintiff a deed of the home place, reserving to herself the right to use and occupy the premises during her life. The land and buildings were valued at that time at about $20,000. The lot was situated on the north side of Church Street [in Brockton] about one hundred and twenty feet east of Main Street, the prin-

cipal thoroughfare in the city. It had frontage of ninety-two feet. The house was a substantial structure, two stories high, in good repair, and in a desirable locality, rapidly passing however from a residential to a business section. At the request of the deceased, the deed was prepared through the assistance and under the direction of her cousin and business adviser, Charles Howard. In his presence the deed was delivered to the plaintiff by the deceased with this statement: 'Delia, this is your house and you will never have to leave it as long as you live. No one can put you out.' 'Put the deed away and keep it.' . . . The deceased further stated that this was not all she ought to do for the plaintiff, and it was not all she intended to. The deceased told the plaintiff that it would be advisable, but not necessary, to have the deed recorded. . . ." The deed remained in the plaintiff's possession, unrecorded, until the death of Mrs. Brett, when it was recorded at the suggestion of the plaintiff's counsel. "After the transfer of the property the relations of the parties with reference to it continued as before, the deceased paying the taxes and assessments, making repairs and improvements."

The circumstances of the gift of the bonds on March 25, 1915, are described in the opinion.

The master further found that all checks for interest on the bonds were drawn and mailed to Martha J. Brett at her address, 24 Church Street, Brockton, "and all were indorsed by the deceased, stamped in each instance by the bank, 'Cash' indicating that cash had been paid when presented at the bank. All such checks were delivered to the plaintiff by the deceased and they were cashed at the bank by the plaintiff and the money received by her paid over to the deceased by the plaintiff in accordance with her usual practice."

The master's summary of his findings was as follows: "I find the deceased was at all times possessed of a clear, vigorous mind, and a full mental capacity to make the gift in question. There is no evidence of fraud or undue influence exercised by the plaintiff or any other person to bring about the gift. No force, no threats, no duress, deception or importunity appears in the case; but rather a close intimacy a well nigh perfect confidence and an abounding affection between two congenial life companions. From this relationship, from an oft expressed purpose and inten-

tion, from statements made to the plaintiff at the time, from the actual physical delivery in hand of the bonds, from their retention by the plaintiff in her possession for four years and up to the death of the deceased, from admissions made to the plaintiff and others after the transaction confirming it, I find the deceased intended to make and did make a complete and absolute gift of these bonds to the plaintiff. I find that both so regarded it. Unless the court shall find to the contrary on the reported facts relative to the payment to the deceased of the interest accruing from the bonds, there was no retention of control or dominion over the bonds by the deceased, rendering the transaction of March, 1915, other than a present irrevocable gift."

Other material findings of the master are described in the opinion. The suit was heard upon the pleadings and the master's report by *Fosdick,* J., by whose order were entered an interlocutory decree confirming the report, and a final decree for the plaintiff. The defendants appealed.

*A. F. Barker,* (*J. W. Keith* with him,) for the defendants.

*W. G. Rowe,* (*E. H. Fletcher & H. K. Stone* with him,) for the plaintiff.

PIERCE, J. This is an appeal from a decree confirming the master's report and the final decree, whereby the claim of the plaintiff to the absolute ownership by gift *inter vivos* of two registered bonds was established, and an order made that the defendants deliver the bonds or the avails thereof to the plaintiff, in performance of their stipulation filed in court in this case.

It is settled in this Commonwealth that an unregistered bond, a bill of exchange, a promissory note, a policy of life insurance or a savings bank book, without an assignment, like a chattel may be the subject of a legal gift *inter vivos* or *mortis causa.* It is also settled that evidences of debt, as distinguished from the debt itself, that is, chose in action without writing, may be the subject of a valid gift and as such constitute an equitable assignment of the debt or other obligation. In either case by an unqualified delivery and acceptance the title passes, the gift becomes perfect and carries with it an implied irrevocable power to enforce it in the name of the donor. *Grover* v. *Grover,* 24 Pick. 261. *Ensign* v. *Kellogg,* 4 Pick. 1. *Hunt* v. *Hunt,* 119 Mass. 474. *Pierce* v. *Boston Five Cents Savings Bank,* 129 Mass. 425. *Slade* v. *Mutrie,* 156 Mass.

19. *Scrivens* v. *North Easton Savings Bank,* 166 Mass. 255. *Bone* v. *Holmes,* 195 Mass. 495. *Knowles* v. *Knowles,* 205 Mass. 290. *Herbert* v. *Simson,* 220 Mass. 480. *Bliss* v. *Bliss,* 221 Mass. 201, 207.

In the case at bar the master found the ultimate fact, based upon undisputed subsidiary facts, that the deceased, the donor, "intended to make and did make a complete and absolute gift of these bonds to plaintiff." This finding of fact would be conclusive were it not for the contention that the donor intended to retain and did retain dominion and control over the bonds by her declarations and the alleged qualifying words which accompanied the delivery of the bonds. The descriptive facts are as follows: "Without a word of comment deceased took the bonds from the drawer, locked at the time, and handed them, encased in an envelope, to plaintiff, with the information that they were two $20,000 bonds of the City of Boston, and that she was going to give them to her saying: 'I want you to have these and keep them for yourself. They are yours and I want you to keep them.' Deceased told plaintiff further that she had been good and faithful to her, that she had taken good care of her when sick, had looked after Mr. Brett, and that all the money she had would not pay for what she had done; that this was not all she was going to get, 'for,' she said, 'what good is the house without money to run it, and she expressed the hope that plaintiff would never leave the place nor have to work after she was gone. Deceased further stated that it was her purpose to have the dividends herself 'to run the house and do repairs, painting and paper hanging.'" The plaintiff took the bonds and always retained them. "There was no evidence that deceased knew where they were kept, except that she knew they were in the house in plaintiff's room." *Smith* v. *Savings Bank,* 64 N. H. 228. *Candee* v. *Connecticut Savings Bank,* 81 Conn. 372.

In the case at bar the findings of the master conclusively established that the intent of the donor at the time of delivery was to make a transfer to the donee of the absolute title, and that the donee accepted the gift as such; and we find nothing in the declaration of the donor when she made the delivery of the bonds to the donee which makes such a finding of fact clearly wrong and a legal impossibility.

*Decree affirmed with costs.*