FENDER ET AL., RESPONDENTS, *v.* FOUST ET AL., APPELLANTS.

(No. 6,216.)

(Submitted January 14, 1928. Decided March 15, 1928.)

[265 Pac. 15.]

*Equity — Estates of Deceased Persons — Jurisdiction — Gifts Causa Mortis—Validity—Evidence—Declarations of Donor— When Inadmissible — Appeal—Findings—When Controlling.*

Equity—Action by Beneficiaries to Recover Personal Property for Benefit of Estate—Jurisdiction.
   1. A court of equity has jurisdiction of an action brought for the benefit of an estate by the beneficiaries under a will, on refusal of the administrator to act, to recover personal property held and claimed by one as a gift from the decedent.
Same—After Acquisition of Jurisdiction Equity will Retain It for Disposition of All Questions Involved.
   2. After a court of equity has taken jurisdiction of a cause it will retain it for the purpose of disposing of all questions involved.
Gifts *Inter Vivos*—Essentials.
   3. The essential elements of a gift *inter vivos* are delivery of the article by the donor to the donee, the accompanying present intention to vest the legal title in the latter and acceptance of it by him, and when so made it becomes at once irrevocable.
Gifts *Causa Mortis*—Essentials.
   4. To constitute a gift one *causa mortis*, it must have been made in contemplation, fear or peril of death; the donor must have died of the illness or peril which he then feared or contemplated,

---

2. Jurisdiction of equity assumed for one purpose as retained for all purposes, see note in Ann. Cas. 1912A, 803. See, also, 10 Cal. Jur. 497; 10 R. C. L. 370.
   3. See 13 Cal. Jur. 36, 37; 12 R. C. L. 932.
   4. Gift *causa mortis*, see note in 99 Am. St. Rep. 890. See, also, 13 Cal. Jur. 42, 44; 12 R. C. L. 957, 962.

and delivery of the subject of the gift must have been made with the intent that title should vest only in case of death.

**Same—Delivery of Promissory Notes Reserving Interest During Life of Donor—Validity of Gift.**

5. Delivery of promissory notes and Liberty bonds with the condition that the interest therefrom should go to the donor as long as he lived does not invalidate the gift as one *causa mortis*, where the other two elements mentioned above (par. 4) necessary to such gift are present.

**Same—Declarations of Donor After Gift Inadmissible in Evidence, When.**

6. While declarations of a donor of a gift *causa mortis* made prior to delivery of the subject of the gift are admissible in evidence, those made after the gift are incompetent for the purpose of defeating the donee's claim to the property so given.

**Same—Delivery of Deposit Book Sufficient Delivery of Deposits.**

7. Where donor, believing himself to be in peril of death from heart disease, handed bank pass-books to his brother with the statement that he should have them, the delivery of the books was a sufficient delivery of the deposits represented by them, his intention to make the gift being shown by a writing left with each bank to the effect that the account in each was a joint one upon which the brother could draw and that on the death of either the other should have what was remaining in the account.

**Same—Findings—When Controlling on Appeal.**

8. While indorsement of promissory notes owned by decedent on turning them over to his brother who claimed them as gifts *causa mortis* was consistent with an intent on the part of the donor to make a gift, supported as it was by oral testimony of others that they were intended as gifts, in view of evidence of still others tending to show that they were delivered to the brother with the intention that they should be a part of decedent's estate to be divided among plaintiffs, his heirs, the finding of the court that they were not intended as gifts may not be disturbed on appeal, under the rule that in equity cases, where the evidence is in conflict, the findings of the trial court are controlling.

---

[1, 2]  Equity, 21 **C. J.**, sec. 117, p. 134, n. 5.  Executors and Administrators, 23 **C. J.**, sec. 426, p. 1193, n. 33.

[3, 4]  Gifts, 28 **C. J.**, sec. 19, p. 627, n. 34; sec. 21, p. 630, n. 66, p. 632, n. 68; sec. 37, p. 643, n. 85; sec. 45, p. 649, n. 61; sec. 97, p. 687, n. 86; sec. 118, p. 697, n. 14.

[5]  Gifts, 28 **C. J.**, sec. 117, p. 697, n. 2.

[6]  Gifts, 28 **C. J.**, sec. 80, p. 675, n. 20; sec. 138, n. 704, n. 10, 12.

[7]  Gifts, 28 **C. J.**, sec. 133, p. 702, n. 73.

[8]  Appeal and Error, 4 **C. J.**, sec. 2870, p. 901, n. 2.

6. Declarations of donor to establish gift *causa mortis*, see note in 99 **Am. St. Rep.** 916.  See, also, 13 **Cal. Jur.** 49; 12 **R. C. L.** 471.

7. Gift *causa mortis* of money on deposit in savings bank, see notes in 26 **Am. Rep.** 684; 48 **Am. Rep.** 506; 51 **Am. St. Rep.** 445; 99 **Am. St. Rep.** 445.  See, also, 12 **R. C. L.** 965.  Gift of savings deposit by delivery of pass-book, see note in 40 **A. L. R.** 1249.  Delivery sufficient to support gift *causa mortis*, see note in 50 **Am. Rep.** 178. See, also, 12 **R. C. L.** 959.

8. See 2 **Cal. Jur.** 921; 2 **R. C. L.** 194.

*Appeal from District Court, Ravalli County; James M. Self, Judge.*

ACTION by Alma Fender and another against James Foust and others. Judgment for plaintiffs and certain defendants appeal. Remanded, for modification.

*Mr. Harry H. Parsons, Mr. George Baggs, Mr. E. C. Kurtz,* and *Mr. J. D. Taylor,* for Appellants, submitted an original and a reply brief; *Mr. Parsons* argued the cause orally.

*Mr. E. C. Mulroney* and *Messrs. Murphy & Whitlock,* for Respondents, submitted a brief; *Mr. A. N. Whitlock* argued the cause orally.

MR. JUSTICE STARK delivered the opinion of the court.

The object of this action is to determine the title to specific personal property claimed by plaintiffs to belong to the estate of Charles Foust, deceased, alleged to be in possession of the defendant James Foust and to recover the same for the estate.

According to the pleadings, Charles Foust, a resident of Ravalli county, died on November 13, 1925, leaving a will in which his estate was devised in equal shares to the plaintiffs and the defendant Vernon C. Foust. This will was admitted to probate and Vernon C. Foust named as administrator thereof with the will annexed, and he duly qualified and is acting as such.

The property involved consists of some promissory notes, Liberty bonds, and also moneys deposited on savings accounts. The plaintiffs contend that a short time before his death Charles Foust turned over to his brother, the defendant James Foust, the notes and Liberty bonds, and so arranged his savings accounts with the banks that they were made payable to himself or James Foust; that no consideration passed from James to Charles in this transaction, and that no gift of said property *in praesenti* or *causa mortis* was intended or made by the trans-

action, but that it was the intention of the deceased to turn over the notes and bonds and authorize James to draw on the bank accounts for convenience only to enable him to divide the same in accordance with the terms of the will, so as to avoid the expense of administration, and that the property and arrangements were accepted by James for that purpose, and no other; that, after the death of Charles, James refused to carry out this arrangement, but that he claims all the property as his own; that the plaintiffs demanded of the defendant Vernon C. Foust, as administrator, that he take steps to recover the property for the estate, which demand was refused; that he also refused to join with them in seeking to establish their rights to the property, and, for that reason, he was made a defendant; that the estate is still in process of administration and it cannot be determined what its debts or obligations are, or whether any of the property involved herein must be resorted to in order to discharge these debts or obligations.

The defendant James Foust asserts that all of the property involved is his own under a gift thereof *causa mortis,* which he claims was made to him by Charles shortly prior to his death, and in his answer sets out the circumstances which he says establish his claim. The defendant Vernon C., individually and as administrator, by his answer in effect disclaimed any interest in the property claimed by James.

The property above referred to and which is involved in the action consists of (1) two unregistered Liberty bonds and numerous promissory notes, some of which were made payable to Charles and by him specifically indorsed to defendant James, the others taken by Charles in connection with loans made by him and by his direction made payable directly to James, some of the notes being secured by mortgages, others unsecured; (2) two savings bank accounts in separate banks.

The plaintiffs ask that this property be adjudged to constitute a portion of the estate of the deceased, and that defendant Vernon C., as administrator with the will annexed, be required to take possession of the same and administer thereon so far

as necessary to satisfy the obligations of the decedent, while the defendant James prays that he be declared to be the sole and exclusive owner thereof as the donee of Charles.

From the issues thus framed by the pleadings it is apparent that the property involved belongs either to the estate of the deceased, or it belongs to James because of a valid gift *causa mortis* to him by Charles. The defendant banks assert no interest in the funds held by them, and may therefore be regarded as merely stakeholders and need not be further considered.

The court called a jury to pass upon the disputed questions of fact and submitted to it eight interrogatories designed to ascertain the intention of Charles with reference to the various articles of property involved, and in the answers to each of these interrogatories the jury found that he did not intend to give any of it to James, but that he did intend that James should divide it among the three children, that is, the plaintiffs and Vernon C. The court adopted the answers made by the jury and entered a decree adjudging the property in question to belong to the estate of the deceased, and directing that the same be turned over to the administrator of his estate and administered and distributed under the will of the deceased. From this judgment the defendants James Foust and Vernon C. Foust appealed.

The defendants interposed a demurrer to the complaint, on various grounds, which was overruled, and this action of the court is assigned as error. Only one of the numerous grounds of demurrer is mentioned in the appellants' brief, viz., that the court had no jurisdiction of the action.

The court did not err in overruling the demurrer on this point. [1, 2] The right of the beneficiaries under a will to bring an action such as this is warranted by the provisions of section 9085, Revised Codes of 1921. (*In re Estate of Deschamps*, 65 Mont. 207, 212 Pac. 512; *Kimball* v. *Tripp*, 136 Cal. 631, 69 Pac. 428.) A court of equity, having taken jurisdiction of a cause, will retain it for the purpose of disposing of all questions involved. (*Maloney* v. *King*, 30 Mont. 414, 76 Pac. 939;

*Stevens* v. *Equity Mutual Fire Ins. Co.,* 66 Mont. 461, 213 Pac. 1110.)

There are numerous other assignments of error set out in appellants' brief, but in the aggregate they present but one question for consideration, namely, whether the decree of the court is sustained by the evidence.

Section 6882, Revised Codes of 1921, defines a gift as: "A [3, 4] transfer of personal property, made voluntarily, and without consideration." Section 6885 says: "A gift in view of death is one which is made in contemplation, fear, or peril of death, and with intent that it shall take effect only in case of the death of the giver."

In the case of *O'Neil* v. *O'Neil,* 43 Mont. 505, Ann. Cas. 1912C, 268, 117 Pac. 889, this court said: "To constitute a gift *inter vivos,* within the statute, the donor must voluntarily deliver the subject of the gift to the donee with the present intention to vest the legal title in the donee, who must accept it. The essential elements are therefore: Delivery, the accompanying intent, and acceptance by the donee. Such a gift is made without condition, and becomes at once irrevocable. A gift *causa mortis* is subject to the conditions: (1) It must be made in contemplation, fear, or peril of death; (2) the donor must die of the illness or peril which he then fears or contemplates; and (3) the delivery must be made with the intent that title shall vest only in case of death."

It is not contended in this case but that the evidence establishes two of the requirements of a valid gift *causa mortis,* viz., impending death from present ailment, and that the donor died of that ailment. This leaves for consideration only whether the property involved was delivered to the defendant James, and, if so, whether such delivery was made to him with the intent that he should become the absolute owner thereof upon the death of Charles.

As to the notes and Liberty bonds, the complaint alleges that [5] they were turned over to James and subsequently refers to that act as a delivery. In his testimony James said: "It

was the understanding that Charles was to have the interest and income from them as long as he lived.'' This fact, however, would not defeat the effect of turning over the notes and bonds to James as a sufficient delivery, if the other elements of a gift *causa mortis* existed. (*In re Klehrs' Will*, 147 Wis. 653, 133 N. W. 1105; *Beaumont* v. *Beaumont* (C. C. A.), 152 Fed. 55; *Strelow* v. *Vonderhide*, 3 Ky. Law Rep. 472; *Mangan* v. *Howard*, 238 Mass. 1, 130 N. E. 76; *Funston* v. *Twining*, 202 Pa. 88, 51 Atl. 736.)

Upon the trial it developed that Charles was a prosperous rancher residing near Stevensville and had accumulated considerable property, consisting of a ranch and its equipment, and also the above-mentioned notes, Liberty bonds, and money in bank, as well as other property not here involved. In 1895 he married a widow who had two daughters, Alma and Nellie, then aged four and two years, respectively, who are the plaintiffs in this action. To this union was born a son, Vernon C., one of the defendants herein. Charles had two brothers, Perry and James; the latter being the principal defendant in this suit. Mrs. Foust died in the year 1916. On May 21, 1920, decedent made a will in which all of the property of which he might die seised or possessed at the time of his death was devised and bequeathed to his son, Vernon C., and the plaintiffs herein in equal shares. The relations between the plaintiffs and their stepfather were pleasant as were the latter's relations to his brothers Perry and James. The stepdaughters married. Nellie was subsequently divorced and remarried. For her first husband, Charles did not have a very high regard because of his lack of frugal habits. When Charles' wife died she had money on deposit in bank in such condition that it required the administration of her estate, and this entailed a considerable amount of expense by way of court costs, attorney's fees, etc., which he regarded as an unnecessary waste of money.

In the spring of 1923, Charles being in a precarious physical condition, was advised by his physicians that he had se-

rious heart trouble; that he might not live long; that he should at once get his business affairs in final shape and seek relief from his ailment in a lower altitude. Pursuant to this suggestion he undertook to make final arrangements of his business and on June 22, 1925, left for Oregon by automobile, accompanied by his stepdaughter Nellie, one of the plaintiffs herein. He remained in Oregon about six weeks without securing the desired relief, then returned home, went to his brother Perry's place, and on August, 6 was stricken with paralysis, which rendered him speechless, in which condition he remained until the date of his death.

The defendant James was a jeweler in Stevensville. Charles kept the notes, mortgages and Liberty bonds in question in James' safe, and, according to the latter's contentions, when Charles was making final arrangement of his business affairs, and on May 20, 1925, he went into James' store, said that he was getting ready to go to Oregon, that he wanted to have his business fixed up so that there would be no trouble after his death, obtained from James the envelope in which the notes, bonds and mortgages in question were contained, handed it back to James, and, quoting from the latter's testimony, said: " 'I will give you these,' and he wanted me to pay his funeral expenses, and he wanted me to have it, so that there would be no trouble after he died; he said the condition he was in he did not know but any minute something might happen." At or prior to this time he had indorsed each of the promissory notes which had not been made payable to James substantially as follows: "Pay to the order of James Foust. [Signed] Charles Foust." James testified that, when Charles handed him the envelope and made the statement concerning the same, he accepted it by saying, "All right," took the envelope and contents, placed the same back in his safe, and had retained them at all times since.

About the latter part of May or first of June, Charles turned over to his brother Perry certain certificates of deposit and corporate stock valued in all at about $6,500, and during the

same interval delivered to his son, Vernon C., a deed for his ranch and gave him in addition thereto a considerable amount of personal property.

In further corroboration of the contentions of defendant James Foust, C. B. Calkins, an attorney residing at Stevensville, testified that he had known Charles for thirty-five years; that shortly before the latter left for Oregon he went to the witness' office, having with him five $100 notes, and said that he wanted to give them to his brother James. Charles indorsed at least four of them, "Pay to the order of James Foust, [Signed] Charles Foust," in the presence of the witness, and was advised that, to make the gift complete, he must actually deliver them to James. These were amongst the notes which came to the possession of James on May 20, as above stated. The witness further said that Charles said to him that he had given the plaintiffs all he thought they were entitled to, and, particularly with reference to Nellie, that he did not intend to give her anything more, and complained of the way she and her husband had disposed of what he had already given them.

Harold Metcalf, a banker residing at Stevensville, in whose bank the decedent transacted a considerable amount of business, testified that shortly before Charles left for Oregon he stated to him that he had given to the girls (plaintiffs) a number of times and that they had gone through with everything he had given them and he felt that he had given them all they were entitled to.

Defendant Vernon C. Foust stated that in June, 1925, prior to going to Oregon, his father said, "I have turned quite a bit over to Jim and that is Jim's," and, further, "I don't want any will; I don't want it brought into any court and probated and have the lawyers to get any."

There are two savings bank accounts involved, the first of which was opened with the Western Montana National Bank of Missoula by Charles, on August 2, 1919. A witness who was in charge of the savings department of the bank at that

time stated that his recollection was that when this account was opened Charles said "he wanted that money to go to his brother in case anything happened to him," but he did not mention the name of the brother. On May 8, 1925, in connection with this account through arrangements made by Charles, he and James signed and left with the bank a card containing the following statement:

"We, the undersigned, having opened a joint account with the Western Montana National Bank, Missoula, Montana, hereby agree that all moneys deposited by us, or either of us, in the said account, shall be placed to the credit of us jointly, and may be withdrawn from or paid out by said bank upon the request or order of both or either of us, and also that, upon the death of either of us, the survivor shall have the absolute right to withdraw or to be paid all moneys then remaining to our credit in said account. [Signed] Chas. Foust. [Seal.] Address, Stevensville, Montana. [Signed] Jas. Foust. [Seal.] Address, Stevensville, Montana.

"No. 415.   Date: May 8, 1925."

This account was opened in the name of Charles and the name was never changed on the books of the bank. The bankbook delivered to Charles was designated as No. 415, and was delivered to James by Charles on May 20, 1925, in connection with the notes and Liberty bonds above referred to.

The second of the savings bank accounts was with the First National Bank of Missoula, and was opened by Charles on May 16, 1924. On May 8, 1925, Charles and James signed and left with the bank a card containing substantially the same statements as the one left with the Western Montana National Bank, above quoted. The savings bank book delivered to Charles in connection with this account was designated by number only and did not bear the name of depositor. This book was delivered to James by Charles about July 13, 1925, after the latter returned from Oregon, in connection with another bank account, which is not in controversy here, and Charles said: "They are yours, and I am through with them."

On behalf of the plaintiffs, Nellie Magee testified that shortly after May 20, 1920 (the date of his will), Charles said to her that he had made a will and wanted her and her sister, Alma, to share equally with Vernon in what he had. About April 1, 1925, he stated to her what he was worth, and said: "You kids will get this."

On May 18, 1925, he said to her in contemplation of his proposed trip to Oregon: "I am going to turn my business over to Jim to handle while we are gone.   *   *   *   I am going to turn these notes over to Jim to handle; I have to leave them with someone—had kept them in James' safe along some time, and that the way he intended to leave to Jim to handle them and divide them up between my sister and brother and I if anything should happen to him." In reference to the money in bank, she said that Charles stated to her he had fixed it so that Jim could draw it out and divide it up "between the three of us."

The plaintiff Alma Fender testified that in the summer of 1920, after the will was made out, Charles said to her: "He wanted everything when he died to go to his children, and he did not want any of his money to go into the lawyers' hands; he had always been close, and he had a dread of any money going to the lawyers." And also: "He told me at that time, too, that he had quite a little trouble with mother's estate. He said he had to borrow $500 to pay his expenses and get the thing straightened out so he could get the property into his hands again." This witness also produced a letter dated February 13, 1917, written by Charles, in which he expressed the desire that after his death his property should go "to you kids." This witness resided at Great Falls, and, after Charles returned from Oregon, visited him at Stevensville, and together they made a trip to Hot Springs, accompanied by the witness' husband, and while there Charles stated to her that he had turned over the notes and money for Jim to handle and that it was to go to "you kids." In another part of her testimony the witness said that: "In all of our conversations about

his estate he always told me he wanted his things divided up equally between us children.''

A. D. Fender, husband of Alma, testified about making the trip to Hot Springs with Charles after his return from Oregon, in company with Alma; that Charles stated to him that he had fixed up his business before he went to Oregon and had turned the notes, money and Liberty bonds over to James, to be divided equally among his three children, and that he had done so because James would handle it for nothing and save administrator's and lawyers' fees.

John A. Totten and his wife, Flora Totten, and Kate M. Ewart, each testified to conversations had with Charles subsequent to the twentieth day of May, 1925, in which he said, in substance, that he had turned over everything to Jim so that each of the children would get his share and Jim would attend to it.

Paul Johnson testified that on May 8, 1925, Charles stated to him that he was going to Portland and before going out there he was going to fix things up with his brother Jim so that everything he had would be divided equally between his three children.

Counsel have discussed the question whether any of these [6] declarations of the decedent were properly admitted in evidence. That such declarations made prior to the delivery of the subjects of the alleged gifts were properly admitted is not open to question. (*Leyson* v. *Davis*, 17 Mont. 220, 291, 31 L. R. A. 429, 42 Pac. 775; *Whitney* v. *Wheeler*, 116 Mass. 490; *Gould* v. *Van Horne*, 43 Cal. App. 145, 187 Pac. 35; *McCoy* v. *McCoy*, 126 Ky. 783, 104 S. W. 1031; *Whitwell* v. *Winslow*, 132 Mass. 307; *McElveen* v. *King*, 88 S. C. 346, 70 S. E. 801; *Pease* v. *Jennings*, 180 Mich. 682, 146 N. W. 260; *Boyd* v. *Boyd*, 123 Ark. 134, 184 S. W. 838.)

In Thornton on Gifts and Advancements, page 198, section 224, it is said: ''Declarations made by the donor after the time of the alleged gift in favor of the donee, or tending to admit that a donation was made of the subject matter of the gift to the donee, are admissible on behalf of the donee and

those claiming under him, to establish the fact of the gift; but such declarations are not admissible on behalf of the donor, to disprove the gift, on the ground that he cannot defeat a title he has once given, although other declarations, admitting the gift, are in evidence for the donee." Amongst numerous cases cited to sustain the statement of the text are *Woodruff, Admr., v. Cook,* 25 Barb. (N. Y.) 505; *Kimball* v. *Leland,* 110 Mass. 325; *Scott* v. *Berkshire County Savings Bank,* 140 Mass. 157, 2 N. E. 925; *Porter* v. *Allen,* 54 Ga. 623.

In *Scheps* v. *Bowery Savings Bank,* 97 App. Div. 434, 90 N. Y. Supp. 26, the holding of the court is well stated in the syllabus, which reads: "Declarations of an alleged donor *causa mortis,* made after the gift, are incompetent for the purpose of defeating the donee's claim to the property so given." The same principle is announced in *Glick* v. *Stumpf,* 204 N. Y. 413, 97 N. E. 865, and *Tierney* v. *Fitzpatrick,* 195 N. Y. 433, 88 N. E. 750.

To sustain their contention that subsequent declarations were admissible to negative the claimed gift, counsel for plaintiff have cited four cases: *Gould* v. *Van Horne,* supra; *Mower* v. *Mower,* 64 Utah, 260, 228 Pac. 911; *De Cou* v. *Howell,* 190 Cal. 741, 214 Pac. 444; and *Williams* v. *Kidd,* 170 Cal. 631, Ann. Cas. 1916E, 703, 151 Pac. 1. In the first of these cases the declarations of a donor of money, made at various times subsequent to the alleged gift, to the effect that she had given the money to the donee as a gift, were admitted in evidence. These statements were properly admitted for the purpose of establishing the gift under the rule announced in the above quotation from Thornton. Each of the other three cases has to do with transactions involving the delivery of deeds which had been signed by grantors and left in escrow for delivery at a future time, and it was held that in such circumstances declarations of the grantor made subsequent to the signing of the deeds and before the delivery thereof were admissible to show his intention at the time the deed was made.

In the instant case there had been an actual delivery of the subject of the alleged gift prior to the time the declarations of

the donor were made, which were admitted in evidence. Under the authorities above referred to, we are of opinion that the subsequent declarations of the donor, in so far as they tended to disprove the alleged gift, were not properly admitted in evidence and should not have been considered in the decision of the case.

Whether there was a sufficient delivery of the savings bank [7] accounts is discussed in the briefs. These accounts, by written statements signed by Charles and James, were made payable to either, with the express declaration in one and the implied declaration in the other, that upon the death of either of the signers the balance remaining in the account should be the property of the other. The pass-books issued in connection with these accounts were originally in the possession of the decedent, who delivered one of them to James on May 20, 1925, and the other on the thirteenth day of July, accompanying the delivery in each instance with the donative declaration. James accepted them. At the time the statements were signed as well as at the time of the delivery of the pass-books to James, Charles was acting in accordance with the previous advice of his physician to make final adjustment of his business affairs, because of the existing ailment from which he subsequently died.

Counsel for the respective parties do not agree upon the construction to be given to the pleadings relative to the delivery of these savings bank accounts to James. Defendants' counsel assert that such delivery was admitted in the complaint, while counsel for plaintiffs contend to the contrary. Counsel for plaintiffs, in discussing the admissibility of the declarations made by decedent, in their brief say: "The only historical element in the declaration is the recital that he [Charles] had turned over the property to his brother James, and this is immaterial, since it was admitted in the pleadings." It may be admitted that this statement was only intended to refer to the notes and Liberty bonds, and not to the savings bank accounts. However, without regard to the pleadings or the above statement in plaintiffs' brief, it appears to us that

when Charles, believing himself to be in peril of death from his then existing ailment, handed the savings bank deposit books to James, accompanying the act with a declaration to the effect that he was through with them and that James should have them, he believed that he was doing all that was necessary to make an actual delivery of the accounts represented thereby to James and to give him an unqualified dominion over them.

In Thornton on Gifts and Advancements, in section 148, it is said: "If the language used by the donor is clear and unambiguous, showing a clear intent to make the gift and a belief on his part that he had done all that was necessary to complete it, then the act of delivery, if slight and ambiguous, will be aided thereby, not, however, dispensing with an actual delivery, but rendering the gift valid where it would be deemed invalid if the acts of delivery were uncertain or ambiguous."

In 12 R. C. L. 965, it is said that the prevailing rule seems to be that a gift of a deposit in a savings bank may be evidenced by the delivery of the deposit-book without a written assignment. The same rule is stated in 2 Morse on Banks and Banking, fifth edition, 612, and in Brady on Bank Deposits, section 26, it is said: "When there has been a delivery of the pass-book representing an account in two names by the person opening the account to the person named as co-owner, with the intent to make a gift, it is held that the gift is complete and valid." To the same effect are the following cases: *Goodrich's Exr.* v. *Rutland Savings Bank,* 81 Vt. 147, 17 L. R. A. (n. s.) 181, 69 Atl. 651; *Robinson* v. *Ring,* 72 Me. 140, 39 Am. Rep. 308; *Ridden* v. *Thrall,* 125 N. Y. 572, 21 Am. St. Rep. 758, 11 L. R. A. 684, 26 N. E. 627; *Appeal of Guinan,* 70 Conn. 342, 39 Atl. 482.

The remaining question concerning these savings bank accounts is whether Charles intended by his acts to make a gift of them to James. The court, adopting the answers of the jury to the interrogatories propounded, found that he did not. We are forced to the conclusion that the evidence decidedly preponderates against this finding. Prior to the time the written statements were made the money belonged to Charles. He had

a right to do with it as he pleased. He delivered the pass-books representing these accounts to James. The property was turned over to him. His intent in reference to it is clearly evidenced by his written statements. There is no ambiguity about them. When he died, it was his intent that James should have them. No oral testimony was necessary to estab-lish this intent. We think that upon any reasonable view of the evidence the court should have found that it established a valid gift *causa mortis* of these savings bank accounts from Charles to James.

Returning to a consideration of the notes and Liberty bonds, [8] and eliminating from consideration the declarations made by the decedent subsequent to their delivery to James, which had a tendency to disprove the alleged gift, there still remains the testimony of the plaintiffs and the witness Johnson con-cerning the declarations made by Charles to the effect that his purpose and intent in turning them over to James was that they should be divided equally between the plaintiffs and Vernon C., and the testimony of James, Vernon C., Metcalf and Calkins indicating that a gift *causa mortis* was intended. The court found that the purpose and intent of Charles in turning over these notes and bonds to James was that they should be divided equally between the plaintiffs and the defend-ant Vernon C., in accordance with the terms of Charles' will. The fact that Charles had indorsed the notes so that James could collect them was consistent with the expressions of his intent in turning them over to James testified to on behalf of plaintiffs. Upon the point now under consideration the competent evidence was in sharp conflict and it cannot be said that it preponderates against the court's findings, and, under the rule frequently announced by this court, such findings will not be disturbed.

For the reasons above indicated, it is ordered that the cause be remanded to the district court, with directions to modify the judgment heretofore entered therein in accordance with the views herein expressed, and, when so modified, it will stand

affirmed. The defendants will recover their costs from the plaintiffs.

*Remanded, for modification.*

Mr. Chief Justice Callaway and Associate Justices Myers, Matthews and Galen concur.