MATHER, Appellant, v. MUSSELMAN et al., Respondents.

(No. 6,426.)

(Submitted March 30, 1929.  Decided June 29, 1929.)

[278 Pac. 998.]

*Messrs. Maddox & Church,* for Appellant, submitted an original and a reply brief; *Mr. Fletcher Maddox* argued the cause orally.

*Mr. W. F. O'Leary* and *Messrs. Cooper, Stephenson & Hoover,* for Respondents, submitted a brief; *Mr. W. H. Hoover* argued the cause orally.

### Opinion: PER CURIAM.

This is an appeal from a judgment or decree in an equity case, and the order of the court overruling appellant's motion for new trial is also called in question. The case was once before in this court, and the decision therein is reported in 79 Mont. 566, 257 Pac. 427, wherein a statement of facts may be found which will not be repeated here, except in so far as necessary to present the specific questions considered.

In the complaint on which the first trial was had, it is alleged that the "tape list," being a statement made by J. J. Musselman to Mather in January, 1924, states the total cost of the building and lot at $84,000, and that the same is erroneous and fraudulent in part, and that the total cost should not exceed $54,000; that, aside from the $40,000 raised from the mortgage on the common property, Mather contributed $22,000 and paid $549.62 interest, amounting in all to $22,549.62, or $8,549.62 in excess of the total cost of the building and lot. On February 7, 1924, J. J. Musselman conveyed all his title and interest in the property to the defendants herein. Musselman died intestate on April 23, 1924, and no estate has been found and no administrator has been appointed. Under these allegations of the complaint the cost of the building and lot, if any above $62,549.62, represents the contribution by Musselman. The answer filed specifically denied many of the allegations of the complaint, among them being the allegation that Musselman contributed nothing to the construction of the building, and that the entire cost thereof did not exceed $54,000. A general denial was made to all matters not admitted or specifically denied.

In the former decision this court held that the complaint, by reason of the allegations of fraud, violations of fiduciary relations, and payment made by plaintiff of the entire cost of the property, did state facts sufficient to constitute a cause of action for the establishment of a constructive trust. It was also held that the trial court committed reversible error in

refusing to consider evidence on behalf of defendants as to items of cost not included in the tape list. It was also found from the facts then before this court "that the cost of construction with cost of the lot totaled $68,977.40," and the cause was remanded with direction to permit amendments to the pleadings and on a retrial to determine the amount contributed by the respective parties and to decree accordingly, giving to defendants the right to make cash contribution, if any was required to equalize the amounts contributed by the parties. Amended pleadings were filed by both parties, which, however, did not change the character of the action or the issues to be tried.

At the outset of the last trial the defendants interposed objections which are now urged by them as determinative of this case. These objections we will here designate and determine: (a) That no cause of action is stated; (b) that the complaint was not amended as required by this court; (c) the complaint is uncertain as to the issues involved; (d) the former decision of the supreme court is *res adjudicata;* and (e) defect of parties defendant.

It was decided on the former appeal that the complaint, identical in substance, did state a cause of action.

Plaintiff should have amended his complaint to accord with the views expressed in our former opinion, but his failure to do so does not necessitate a dismissal of his appeal, as the cause was tried on the theory of an accounting, raised by the allegations of the answer, and all matters necessary to a decision thereon are now properly before the court for decision.

In a suit in equity, the pleader is not concluded by his prayer, nor by the form of his pleading (*Anaconda Copper Min. Co.* v. *Thomas,* 48 Mont. 222, 137 Pac. 380), and the mere pleading of an equitable defense will authorize the granting of whatever affirmative relief the pleader shows himself entitled to, consistent with the pleadings. (*Pittsmont Copper Co.* v. *O'Rourke,* 49 Mont. 281, 141 Pac. 849.) After a court of equity has taken jurisdiction of a cause, it

will retain it for the purpose of disposing of all questions involved. (*Fender* v. *Foust*, 82 Mont. 73, 265 Pac. 15.) Having acquired jurisdiction of the parties and of the subject matter of the suit, the pleadings and proof being sufficiently broad to now justify findings as to the respective interest of the parties in the property in question, we will finally dispose of the matter and end the litigation.

One of the objections to the introduction of evidence on ▇ certain items at the first trial was that they were not specially pleaded. From the construction of the pleadings given by the trial court at the first trial, and under the theory on which the cause was tried, the plaintiff's only chance to prevail was a failure of evidence to show substantial contributions by Musselman. The error in the introduction of evidence at the former trial made a retrial necessary, irrespective of any amendments. Neither was the question as to architect's and contractor's fees foreclosed by the supreme court decision. These items were simply not considered in the decision wherein it was found that Musselman had contributed a substantial amount, and this amount could also be increased or diminished by further evidence.

To preserve the equities between the parties, the cause was remanded for the taking of additional testimony as to the amount contributed by the respective parties, and this also applied to both parties. The issues were made plain. The former decision was not a final decision of any issuable question of fact.

The defendants contend that the case is now an action in ▇ accounting and that an administrator of the estate of Musselman, deceased, is necessary and without whom the action cannot be maintained.

The legal title, right and interest held by J. J. Musselman passed to these defendants prior to his death, and are now held by them. The action is directed against that title, right and interest, not against the estate of Musselman, deceased. They are the only parties in interest, and theirs are the only rights

affected by reason of the allegations of fraud and fiduciary relation. The action is one to establish a constructive trust, and neither the fraud nor the violations could be proven without considering the contributions made by the respective parties. Under these conditions this court held that the action partook so far of the nature of a resulting trust as to require evidence of the cost of the building and by whom paid. True, the defendants at the trial were deprived of the testimony of J. J. Musselman, and an administrator would suffer the same privation. Defendants could introduce all evidence that could be produced by an administrator.

If the strict construction contended for by defendants were given to the term "constructive trust," the plaintiff's case would have ended as soon as it was ascertained that Musselman had made substantial contributions.

In support of their motion for a new trial, affidavits of ▮ counsel for plaintiff were filed, claiming irregularity on the part of the trial judge in "taking testimony relative to the merits of the case after the case had been closed and finally submitted." This, it is alleged was misconduct, flagrant and indefensible. Both the affidavits filed on the part of plaintiff, while positive in form, are wholly hearsay. There is not any affidavit or statement from Leigland, Pappin or Rutherford, alleged to have been interviewed by the trial judge; the second affidavit merely states, in substance, that the first affidavit is well founded. These affidavits set out the information claimed to have been received by the court after the case was submitted. They relate to the price of material as to Leigland and Pappin, and as to the different uses of No. 3 boards, as to Rutherford. Leigland was a witness at the trial and testified to the very facts set out in the affidavit, and this evidence is undisputed; hence it was neither new, nor additional, nor cumulative, evidence, but repetition. Pappin was not a witness, but the statements were the same as the undisputed testimony given by witnesses at the trial. Being undisputed, it was the duty of the court to follow it. Rutherford was a

witness at the trial, and, as alleged in the affidavit, did not recall the questions subsequently asked, ''but believed it related to the different uses to which No. 3 boards were put in the construction of buildings.''

The counter-affidavit, made and filed by counsel for defendants, consists mostly of quotations from the record evidence and to denial of *irregularity*. It is argued by plaintiff that the judge did not see the record, and, if he did see it, he did not understand what he saw there. In its findings the court used the figures given by the witnesses at the trial with reference to the matters referred to in the affidavits; hence we conclude that the court did both see and understand. A case is to be tried in court, not out of court, and the fact that the court in its findings used the undisputed mathematical calculations of the witnesses at the trial falls far short of showing either irregularity or misconduct.

In *Finlen* v. *Heinze*, 28 Mont. 548, 73 Pac. 123, cited by plaintiff, the facts are so wholly different from those in the instant case as to render it inapplicable, but the remarks of Mr. Chief Justice Brantly there are very apropos here. Here there was no information asked or obtained from an interested party and no discussion of the case with anyone, but the affidavits or inquiries were respecting the prices of the material or labor, or the use to which certain lumber was put in buildings, the evidence of which was in the record uncontested, and which the court was bound to follow, and did follow in its findings. It was a matter of copying figures, rather than the exercise of discretion. In the *Heinze Case* there was the drunkenness and debauchery, traveling about with the agent of one of the parties, the promise of financial assistance and generous future rewards, and the letter making these financial offers was affectionately recognized by the judge, and he immediately made an appointment with the agent. It would be a travesty to compare this case with that. The court did not err in refusing to sustain the charges made.

The different systems employed in making estimates, allocating accounts, classifying material, and grouping figures seems to have been productive of very divergent conclusions. Prior to the completion of the building, L. L. Rude, a building contractor, from sketches and plans shown him by Musselman, estimated the cost of the building at $60,000 without commissions, or between $60,000 and $68,000 including commissions "and everything." This was on a 3-story, 28-apartment building, and did not include furniture, or electric ranges, or iceboxes, nor does it appear to include the price of the lot. It does not appear that Rude did more than give his opinion as to the cost of a building of the size mentioned. The building subsequently erected was a 4-story, 32-apartment building. Plaintiff's estimate, as appears in the original complaint, did not exceed $54,000, including the lot. In the amended complaint this is placed at $57,352.80.

J. H. Addison, an accountant, employed by plaintiff, finds the cost to be $57,000 or $59,000. But these figures were obtained merely by making allowable deductions from the "tape list," and were not asserted to show the cost of constructing the building. These are the figures on which plaintiff bases his claim for the declaration of a constructive trust. On the other hand, proof on behalf of the defendants tends to establish the correctness of the following computations: The Lease and Leigland estimate of replacement is $83,906.50 for the building alone. Adding to this plaintiff's claimed price of the lot of $3,247,50, gives the total cost of $87,154.

In March, 1923, when the building was within about a month of completion, application was made for a loan. The loan company estimated the value of the building at $90,000 and the lot $4,500, making $94,500 as the estimated value of the property.

During the first trial, Mr. C. G. Harris was appointed as referee by the court, with direction to hear the evidence and report findings of fact. Subsequently the referee made his

report, finding the total cost of the building and site to be $80,677.21. At the last trial the court found the cost to be $72,559.30. This includes $4,745.87 as architect's and superintendents' fees.

Plaintiff claims that, aside from the $40,000 raised by the mortgage on the common property, which is a charge thereon, he invested $22,549.62. At the trial defendants offered to buy and pay that sum, with interest thereon at eight per cent per annum for his one-half interest in the adventure. This offer was refused. This is not a case where the give and take theory is binding upon either party. However, the offer and refusal are quite convincing evidence that at that time plaintiff preferred the property to the return of his investment, with interest.

These varying estimates of cost were submitted to the trial court and are now here for final determination upon the evidence.

The trial court attempted to canvass the evidence submitted on both the first and second trial, included in twelve or thirteen hundred pages of the record, much of which is of little probative value, and, after an exhaustive study of those records, we have concluded that the trial court made allowances to the defendants and deductions to the plaintiff not warranted by the evidence; but when we attempt to make a satisfactory conclusion from the evidence we find ourselves in a maze which leads nowhere. The evidence is in such a condition that no one can say with any degree of certainty as to what allowances or deductions should be made with respect to either the ''tape list'' or the alleged proof of items supplied by Musselman; his death removed the only possible source of accurate proof.

However, it is clear from the record as a whole that the total cost of the building exceeded the total amount supplied by plaintiff and the $40,000 mortgage by a substantial amount, and it is clear that this amount does not exist as outstanding indebtedness constituting liens upon the property. If fully paid up, and the record does not indicate that it is not, it

should be immaterial to the plaintiff from what source it was obtained.

We have therefore adopted the following method of computation as the only reliable means of arriving at a reasonably accurate conclusion as to the total cost of the property in controversy and of an equitable adjustment of the rights of the parties, and thus end the litigation:

The Lease and Leigland estimate is the only reliable computation as to the cost of such a building; it was made by men in the business thoroughly competent to determine the matter; they went into the minutest detail of construction, and determined to the penny the cost of each item necessary for its construction, after a careful survey of the building throughout and measurements made.

Starting, then, with this estimate or computation as a basis, we will make those additions and deductions which we deem the evidence warrants and thus arrive at the amount each of the joint adventurers should have contributed to the construction of the building.

Certain of the items included in the estimate did not go into the construction of the building; some were paid for out of rents received from the building and not by Musselman or anyone for him; certain of the items claimed to have been paid for out of rent were paid for, according to their testimony, by these defendants, and remain as a charge against the property. This is possible, as G. W. Musselman was shown to have been working at the smelter, and, at the same time was allowed, without objection, $100 per month for looking after the apartment house.

In the following computation we have included only those items which seem to have been fairly proven by competent evidence:

Starting with the Lease and Leigland estimate....    $83,906 50

    We add thereto:

1. The proven cost of the lot.........$3,247 50
2. Amount paid for making screens, not
    included in the estimates, but make

no allowance for cost of screen as it
was not shown.................. 178 50
3. Mouldings and extras purchased, but
not taken into account in the esti-
mate .......................... 381 85
4. Electric saw purchased and installed
in the building by defendants..... 251 00

Total additions ....................... 4,058 85

Total prima facie cost of entire property.... $87,956 35
We deduct therefrom:
1. Partial excavation on lot at time of
purchase, valued at...............$ 200 00
2. Items which went into the estimate
but were paid for from rent:
Sanding floors .................... 400 00
Labor .......................... 225 58
32 electric ranges................. 3,200 00
Balance on carpets, etc............. 1,200 00
Finishing fourth floor............. 1,499 72
3. Estimated cost of contractor's bond,
not shown to have been furnished.. 1,210 00
Difference in cost of Industrial Ac-
cident bond, less than estimate.... 219 75
4. One ice box less than in estimate..... 20 00
5. Items shown to have cost less than
estimate to the following extent:
Electric wiring .................. 373 76
Windows and frames............. 119 30
Doors and frames................ 135 00
Cupboards and stairs............. 495 00
Lumber (estimated) ............. 500 00
6. Items in estimate not shown to have
been paid out:
Foreman's fee ................... 1,000 00

Contractor's 10% less the amount
admitted due for the services of
Musselman or $7,334.50—$2,080.72 5,353 78
Architect's fee .................. 3,227 00

Total deductions ..................... 19,378 89

Total actual cost.................... $68,586 46

From the evidence it is clear that Musselman had a complete set of plans, specifications, and blue-prints for the proper construction of the building, though they were not available at the trial and no evidence was introduced as to their author or the cost thereof. It is, however, clear from the evidence and from common knowledge that such plans, etc., were absolutely necessary for the construction of the building, and Musselman himself could not have prepared them, and, as said above, it should be a matter of no concern to plaintiff where they came from, so long as he received the benefit without extra cost to him. Lease testified that the cost of plans and specifications, without superintendence, was customarily figured at four per cent, with two per cent added where the architect superintended the building. It is clear that no architect performed this latter service, and four per cent should be allowed, instead of the seven per cent allowed by the trial court. However, before figuring this fee, there should be deducted from the total cost the following items:

Total cost forward............................ $68,586 46
Balance on carpets, etc..................$104 50
Set-in beds ............................ 175 00
Electric saw .......................... 251 00    530 50

$68,055 96
Four per cent. thereof is...................... 2,722 25

Total amount to be paid by joint adventurers..... $71,308 71
Amount of mortgage on property at completion... 40,000 00

Amount paid by joint adventurers.............. $31,308 71

Each should have paid the one-half, or
$15,654 35

However, plaintiff ultimately paid to Musselman
or his wife after his death.................... $22,549 60
Deducting his half........................... 15,654 35

Shows an overpayment by plaintiff of........... $ 6,895 25

This overpayment was, however, not made during the construction of the building, during which time he contributed but $15,000.

When the building was practically completed, Musselman represented to plaintiff that he (Musselman) had overcontributed $7,000, and induced plaintiff to give him a second mortgage on the property therefor. As this statement was not true and the payment of the mortgage note caused Mather to pay the sum of $6,895.25 more than his share of the total cost, the payments made on the mortgage note should be considered in the light of a loan to Musselman to that extent, and the defendants, on the theory of accounting, should be compelled to make Mather whole by paying interest on that amount for the time he was wrongfully kept out of the use of his money. He has already been credited with the amount he paid in interest on the $7,000 note; he should now be credited with interest on the $6,895.25 from the times he made payments. This would be interest at eight per cent per annum on each sum paid on the $7,000 note, with the exception of the last payment, which should be reduced to the balance due on $6,895.25.

The record shows payments on principal, January 2, 1924, $4,000; January 21, 1924, $400; March 12, 1924, $500; balance paid June 6, 1924. The balance of Mather's overpayment, constituting a loan to Musselman, is $1,995.25.

The cause is remanded to the district court of Cascade county, with direction to modify the judgment and decree by substituting the sum of $6,895.25 for the sum of $6,285.97 therein, and adding thereto interest computed on the above amounts, making up the $6,895.25, from the date of each pay-

ment to the date of the modification at eight per cent per annum and granting to defendants thirty days in which to make such payment.

As modified, the judgment will be affirmed; plaintiff to have one-half of his costs on appeal.

MR. CHIEF JUSTICE CALLAWAY, ASSOCIATE JUSTICES MATTHEWS, GALEN and ANGSTMAN and HONORABLE W. H. POORMAN, District Judge, sitting in place of MR. JUSTICE FORD, disqualified, concur.