O'NEIL, EXECUTOR, RESPONDENT, *v.* O'NEIL, APPELLANT.

(No. 2,981.)

(Submitted September 18, 1911. Decided October 3, 1911.)

[117 Pac. 889.]

*Estates of Deceased Persons—Gifts Causa Mortis—Definition— Burden of Proof—Certificates of Deposit—Validity of Gift— By What Law Determinable—Evidence—Sufficiency.*

Estates—Recovery of Assets—Gifts—Action at Law.
    1. Pleadings in an action brought by an executor to recover as assets of his testator's estate certain certificates of deposit, claimed by defendant as a gift *causa mortis, held* to have presented purely legal issues, and not such as were cognizable in a court of equity.

Gifts *Causa Mortis*—Essentials.
    2. To render a gift *causa mortis* effective the following elements must concur: (1) It must have been made in contemplation, fear or peril of death; (2) the donor must have died of the illness or peril which he then feared or contemplated; and (3) the delivery must have been made with the intent that title should vest only in case of death.

Same—Validity—Burden of Proof.
    3. The burden of proof rested upon defendant to show, *inter alia,* that the deceased delivered the certificates sought to be recovered as a part of his estate as a gift, and not merely as a deposit for safekeeping.

Same—Certificates of Deposit—Indorsement.
    4. Though indorsement of the certificates by deceased was not absolutely essential to the validity of the gift to defendant, delivery of such an instrument being sufficient to transfer the equitable title, the omission of this formality was a fact to be taken into consideration in determining whether deceased intended to transfer title.

Same—Evidence—Sufficiency.
    5. Evidence *held* sufficient to sustain the finding of the jury that delivery of the certificates of deposit, claimed by defendant as a gift *causa mortis,* was not intended by deceased as a transfer of title.

Same—Validity—How Determinable.

    6.  The validity of a gift *causa mortis* is determinable by the law of the place where it is made, without reference to the domicile of the donor.

Same—Law of Place—Evidence—Instructions.

    7.  The alleged gift having been made in the state of Minnesota, the trial court, for the purpose of ascertaining the law of that state relative to gifts *causa mortis*, admitted in evidence reported decisions of the supreme court of that state, and instructed the jury accordingly. The definition of such a gift made by the Minnesota appellate court is in conformity with the common law, embodied in section 4638, Revised Codes. *Held*, that appellant was not in a position to assert prejudicial error, either in the manner of ascertaining the law of Minnesota or in instructing the jury in accordance therewith.

*Appeal from District Court, Yellowstone County; Sydney Sanner, Judge of the Seventh Judicial District, presiding.*

CONSOLIDATED ACTIONS by Edward O'Neil, as executor of the estate of John O'Neil, deceased, against the First National Bank of Billings, the Yellowstone National Bank of Billings, the Thomas Cruse Savings Bank, Yegen Brothers, Bankers, and James O'Neil. From a judgment in favor of plaintiff and from an order denying him a new trial, defendant James O'Neil appeals. Affirmed.

*Mr. James A. Walsh, Mr. R. E. Noyes,* and *Mr. J. R. Donohue* submitted a brief in behalf of Appellant. *Mr. Walsh* argued the cause orally.

This is an equity case. The subject matter is the conflicting claims of the plaintiff and the defendant, as to the ownership of certain certificates of deposit. It is in the nature of a bill of discovery, as all equitable actions are, requiring the defendant to come in and declare by what right he holds certain property, setting forth injunctional rights, and to quiet title to personal property. This could only be done in an equitable action, in granting relief that was granted in the judgment in this action. (Story's Equity Jurisprudence, sec. 31; Pomeroy's Remedies and Remedial Rights, sec. 369.) Under the provisions of our Code, this court must try the case *de novo*.

The court erred in charging the jury that they were to determine the question of the sufficiency of the testimony to establish

a gift *causa mortis* from John O'Neil to James O'Neil of the certificates of deposit in question from the laws of the state of Minnesota and not from the laws of the state of Montana. There was no evidence offered of any statutory law of Minnesota. The only decisions of the court of last resort of the state of Minnesota on the question of gifts *causa mortis* are: *Allen* v. *Allen,* 75 Minn. 116, 74 Am. St. Rep. 442, 77 N. W. 567; *Davis* v. *Kuck,* 93 Minn. 262, 101 N. W. 655; *Winslow* v. *McHenry,* 93 Minn. 508, 106 Am. St. Rep. 448, 101 N. W. 799; *Varley* v. *Sims,* 100 Minn. 331, 117 Am. St. Rep. 694, 111 N. W. 269, 8 L. R. A., n. s., 828, 10 Ann. Cas. 473. These cases are the only ones decided by the supreme court of Minnesota on the question of gifts *causa mortis.* None of the cases introduced in evidence hold that the donor must die from the sickness or peril existing at the time the gift was made. A careful analysis of each case will show that in each and every decision there was but one question before the court for determination and but one question decided, and that was the sufficiency of the delivery of the subject of the gift.

We contend that it is not necessary that the donor should die of the disease from which he was suffering at the time he made the gift. It is only necessary that he does not recover from it. (*Ridden* v. *Thrall,* 125 N. Y. 572, 21 Am. St. Rep. 758, 26 N. E. 627, 11 L. R. A. 684.) In that case the donor was about to submit to a surgical operation. (See, also, *Grymes* v. *Hone,* 49 N. Y. 17, 10 Am. Rep. 313; *Zeller* v. *Jordan,* 105 Cal. 143, 38 Pac. 640; *Larrabee* v. *Hascall,* 88 Me. 511, 51 Am. St. Rep. 440, 34 Atl. 408; *Nicholas* v. *Adams,* 2 Whart. (Pa.) 17; *Blazo* v. *Cochrane,* 71 N. H. 585, 53 Atl. 1026; *Castle* v. *Persons,* 117 Fed. 835, 54 C. C. A. 133.) In this case the gift was made a year previous to death. (Redfield on Wills, page 99; 20 Cyc. 1235; *Gourley* v. *Linsenbigler,* 51 Pa. 345; *Craig* v. *Kittridge,* 46 N. H. 57.) A gift made by a person about to undergo a surgical operation is a valid gift *causa mortis.* (*Knight* v. *Tripp,* 121 Cal. 674, 54 Pac. 267; *Stewart* v. *Whitemore,* 3 Cal. 213, 84 Pac. 841; Thornton on Gifts, secs. 25, 28, 29.)

For Respondent, there was a brief by *Mr. George W. Farr* and *Mr. C. C. Hurley,* and oral argument by both.

This is not an equity case, but is an action at law and one wherein the verdict of the jury, being general, will control and is final unless clearly contradictory to the evidence and to the law of the case. That this case is at law rather than in equity is supported by practically all of the authorities, only a few of which are here given. (20 Cyc. 1227, 1248; *Dunn* v. *German-American Bank,* 109 Mo. 90, 18 S. W. 1139; *Malone* v. *Doyle,* 56 Mich. 222, 23 N. W. 26; *Crue* v. *Caldwell,* 52 N. J. L. 215, 19 Atl. 188.) The last case, *supra,* is practically in point by reason of the fact that there is such a sharp distinction in the reports of New Jersey between actions at law and actions at equity.

The validity of a gift *causa mortis* is to be determined by the law of the place where it is made without reference to the domicile of the donor (20 Cyc. 1243)—and without regard to the law of the state where the cause of action involving the gift is tried. (*Emery* v. *Clough,* 63 N. H. 552, 56 Am. Rep. 543, 4 Atl. 796; *Burt* v. *Kimbell,* 5 Port. (Ala.) 137; *Tarlton* v. *Briscoe,* 7 Bibb. (Ky.) 73.) In paragraph 4 of the reply, the plaintiff has specifically alleged the law of the state of Minnesota as declared by the highest appellate court thereof and the sufficiency of that pleading has never been questioned in any way. It was necessary for the plaintiff to prove these allegations of the reply. (*Bank of Commerce* v. *Fuqua,* 11 Mont. 285, 28 Am. St. Rep. 466, 28 Pac. 281, 14 L. R. A. 588.) There was no statutory law of the state of Minnesota pleaded because none exists, and the general law on the subject as established by the court of highest resort of the state was pleaded and proved in four different cases.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

John O'Neil died at Glendive, Dawson county, Montana, on September 22, 1908, at the age of sixty-eight years. He had neither wife nor children. He left a will dated August 12, 1908. designating the plaintiff, a brother, as his executor. By order

of the district court in and for Dawson county, made on March 31, 1910, the will was admitted to probate, and the plaintiff, having qualified as executor, entered upon the discharge of his duties. Prior to his death the deceased had made deposits in different amounts with the defendant banking institutions, which were evidenced by certificates payable to himself and amounting in the aggregate to about $12,000. The deceased was a resident of the city of Helena, Montana, but the will was executed at Glendive, where he had stopped to visit the plaintiff and his family while on his way to Rochester, Minnesota, to secure special medical treatment, having for some time theretofore been in failing health. On August 20 he telegraphed to the defendant, James O'Neil, who resided at Hudson, Wisconsin, to meet him in St. Paul, Minnesota, to accompany him to Rochester. The two met in St. Paul on August 21 and proceeded at once to Rochester. They remained there together at a hotel until August 24, when James returned to his home. In the meantime the deceased was under treatment by his physician preparatory to undergoing a surgical operation which it was thought would probably aid his restoration to health. For safekeeping he put into the hands of one Fridell, the proprietor of the hotel, his watch and a wallet containing the certificates of deposit mentioned, together with other papers. On September 6 James O'Neil returned to Rochester, having been informed by the deceased by telegram that the operation would be performed within two days. On the next day, and before going to the hospital to undergo the operation, the deceased obtained the watch and wallet from Fridell and handed them to his brother. The certificates were not indorsed. The operation was performed on September 8. James remained at Rochester, spending a part of each day with the deceased at the hospital, until September 10; on that day he went to his home taking the wallet and its contents with him. He did not thereafter return to Rochester to see the deceased. After four or five days the deceased, having survived the operation though still weak from the effects of it and his illness, returned to the hotel and remained there until September 18, when he left, returning to Glendive,

the home of plaintiff, where he remained until his death. He was accompanied by a son of plaintiff whom he had summoned from Glendive by telegram to come to Rochester to attend him. Separate actions were brought by the plaintiff, as executor, against each of the banks to recover the amounts of the different deposits as assets belonging to his testator's estate. James O'Neil was made defendant in all of them. The action against the Cruse Savings Bank was originally brought in Lewis & Clark county; the others were brought in Yellowstone county, the place at which the defendant institutions, other than the Cruse Savings Bank, are doing business. The first was by agreement of the parties transferred to Yellowstone county, whereupon all of them were consolidated and tried as one. Disclaiming any interest in the deposits, the defendant banks were permitted to pay into court the amount due from them respectively. James O'Neil alone answered. As a defense he alleged, in substance, that after the execution of his will and during the month of September the deceased was suffering from a dangerous illness; that in the hope of obtaining relief he was about to undergo a surgical operation; that prior to undergoing the operation, being aware of the attendant danger and apprehensive that death might result from his illness and the operation, the deceased gave to the defendant James O'Neil the certificates of deposit held by him; that immediately thereafter the deceased submitted to the operation; that he subsequently, on September 22, died of his illness, and that the defendant, having accepted the gift of the certificates, thereby became the owner of them and the amounts due upon them. The issues made upon these allegations by the reply of the plaintiff were found by the jury by a general verdict in favor of the plaintiff. Judgment was rendered against each of the banks for the respective amounts due from them, and against James O'Neil for the costs of the actions. This defendant has appealed from the judgment and an order denying his motion for a new trial.

Some contention is made by counsel upon the question whether these actions are at law or in equity, the appellant contending that they are in equity and hence that this court should examine

the record and determine the questions of fact and law arising thereon, under the provisions of the Code applicable to such [1] cases. (Rev. Codes, sec. 6253.) We are inclined to the view that the pleadings present strictly legal issues only, and that under the rule so often stated by this court, the finding of the jury must stand if any substantial support for it is found in the evidence. But assuming that the position taken by counsel for appellant is correct and giving him the benefit of the more liberal mode of review prescribed by the statute as it has heretofore been construed and applied (*Bordeaux* v. *Bordeaux*, 32 Mont. 159, 80 Pac. 6; *Finlen* v. *Heinze*, 32 Mont. 354, 80 Pac. 918; *Pew* v. *Johnson*, 35 Mont. 173, 119 Am. St. Rep. 852, 88 Pac. 770; *Delmoe* v. *Long*, 35 Mont. 139, 88 Pac. 778), we are nevertheless of the opinion that the contention—which is the principal one made by appellant—that the evidence is insufficient to justify the finding of the jury must be overruled.

The statute defines a gift as a "transfer of personal property, made voluntarily, and without consideration." (Rev. Codes, sec. 4635.) It defines a gift *causa mortis*, or one made in view of death, as follows: "A gift in view of death is one which is made in contemplation, fear, or peril of death, and with intent that it shall take effect only in case of the death of the giver." (Sec. 4638.) To constitute a gift *inter vivos*, within the statute, the donor must voluntarily deliver the subject of the gift to the donee with the present intention to vest the legal title in the donee, who must accept it. The essential elements are therefore: the delivery, the accompanying intent, and acceptance by the donee. Such a gift is made without condition, and becomes [2] at once irrevocable. A gift *causa mortis* is subject to the conditions: (1) it must be made in contemplation, fear or peril of death, (2) the donor must die of the illness or peril which he then fears or contemplates, and (3) the delivery must be made with the intent that title shall vest only in case of death. While there is some conflict in the authorities upon the question whether the title vests upon delivery, subject to be defeated by the recovery of the donor, or vests only upon the death, they uniformly agree that all these elements must concur to render the

gift effective. *(Leyson* v. *Davis,* 17 Mont. 220, 42 Pac. 775,
31 L. R. A. 429; *Daniel* v. *Smith,* 64 Cal. 346, 30 Pac. 575;
*Zeller* v. *Jordan,* 105 Cal. 143, 38 Pac. 640; *Williams* v. *Guile,*
117 N. Y. 343, 22 N. E. 1071, 6 L. R. A. 366; *Ridden* v. *Thrall,*
125 N. Y. 572, 21 Am. St. Rep. 758, 26 N. E. 627, 11 L. R. A.
684; *Allen* v. *Allen,* 75 Minn. 116, 74 Am. St. Rep. 442, 77 N.
W. 567; *Varley* v. *Sims,* 100 Minn. 331, 117 Am. St. Rep. 694,
111 N. W. 269, 8 L. R. A., n. s., 828, 10 Ann. Cas. 473; *Gourley*
v. *Linsenbigler,* 51 Pa. 345; *Blazo* v. *Cochrane,* 71 N. H. 585,
53 Atl. 1026; *Larrabee* v. *Hascall,* 88 Me. 511, 51 Am. St. Rep.
440, 34 Atl. 408; 3 Redfield on Wills, pp. 324, 326; Thornton
on Gifts, sec. 25 *et seq.;* 1 Williams on Executors, 887, 20 Cyc.
1236.) Hence the statute, though in theory it makes the vesti-
ture of title dependent upon the death of the donor, embodies the
common-law definition recognized by the courts generally.

Counsel devote much of their argument to the question whether
the evidence justifies the conclusion that the deceased was moved
to make the gift of the certificates to his brother because, weak-
ened as he was by his existing illness, he feared that he would
die under the operation, or whether he was apprehensive that
he would eventually die of his illness even though he might sur-
vive the operation. As we view the evidence, it is not of moment
what his apprehension was. As appears from the instructions
[3] submitted to the jury, the court proceeded upon the theory—
which is correct—that the burden was upon defendant to estab-
lish his claim. This required him to show, not only that the
delivery to him by deceased was induced by fear of approaching
dissolution, but also that the intention was to vest title in the
defendant in case death occurred as he then feared. In other
words, it was a question upon the evidence whether the deceased
intended the delivery of the wallet and watch as a gift or merely
as a deposit for safekeeping. The solution of this question, de-
pending as it did upon the credibility of the witnesses as to what
transpired at the time the delivery was made, was exclusively
within the province of the trial court. A brief reference to
some of the salient points in the evidence will be sufficient to
demonstrate that its conclusion ought not to be disturbed.

The defendant testified: "In the hotel we came downstairs, me and John, and me and John went to the office and he asked the hotel man to telephone for a hack and look up his bill; he was going to the hospital. So the hotel man telephoned for a hack and looked up his bill, and in a minute the hack got there; so John paid his bill and Mr. Fridell says: 'John, when you get well and so you will be able to leave the hospital I would like to have you come back and stay with us.' John says: 'I don't believe I will be able to come back.' So he says to Mr. Fridell, 'I have got some papers and a watch in your safe. Will you please give them to me?' Mr. Fridell opened the safe, unlocked, and handed the papers and watch to John, and John turns around to me—* * * Q. What did John say when— A. John said, 'James, I don't believe I will ever get well; I am afraid I am going to die. Here is some certificates of deposit and my watch, you take them and keep them and if I die they are yours. Q. How long did you remain in Rochester after the operation was performed on John? A. I stayed until September 10. Q. September 10? A. Yes, sir. The operation was performed the 8th. Q. On the 8th? A. Yes, sir. Q. Where did you then go? A. Went back to the hotel. I went up every morning; had two hours in the forenoon and three hours in the afternoon. I would go up there and sit there. Q. After you left the hotel on the 10th, where did you go? A. I went home. I was sick myself; that is why I went home; I got the dysentery and I went home. Q. Did you afterwards go back? A. I intended to go back the next Saturday; but in the meantime I got a letter from my nephew, John O'Neil." This letter conveyed to him the information that the deceased would leave St. Paul on September 18 on his way to Glendive. Though defendant's home was only eighteen miles from St. Paul he did not go to meet deceased.

Fridell testified: "John and James came down in the afternoon, and John says, 'Order me a hack and look up my bill,' and he paid his bill, $9.50, I think it was. * * * He said, 'I hardly think I will pull through, but if I do I will be glad to

come back. Q. What else? A. He asked for his papers and watch; package of papers and watch, and I unlocked the safe and handed him his papers and watch. Q. Handed him this pocketbook? A. Yes, sir, and a watch. * * * Q. And were the certificates in this pocketbook that you had seen previously? A. Yes, sir. Q. What did John do with them, and what did he say? A. He turned to his brother— Q. What brother? A. James O'Neil, and he said, 'James, I don't believe I will ever get well. Here is some certificates and my watch; you take them and keep them, if I die they are yours.' He then felt that his Montana people—he said, 'That old stiff out in Montana has his mitt out for everything; he would not do a hand's turn without he expected money.' Q. What did James do? A. James put the certificates in his pocket. Q. When you say 'certificates' what do you mean? A. The watch and the pocketbook.''

If these statements stood alone and were not impeached by direct contradiction or by circumstances, it might well be argued that the finding of the jury was contrary to the evidence, for there is nothing inherently improbable in them. But when they are weighed in the light of the circumstances as they existed, the character and disposition of the deceased, and the subsequent conduct of the defendant and his witness Fridell, the truth of them is open to serious question. John O'Neil, it appears, was very averse to contracting indebtedness and was habitually prompt in the payment of his obligations. There is some testimony that when he went to Rochester he had in his wallet several hundred dollars in currency, besides the certificates. What became of the currency it is not important now to inquire. When his nephew reached him in Rochester in response to his telegram, he was wholly without funds, and it was necessary for the nephew to obtain them from home to pay the hotel bill and railroad fare. The hospital and surgeon's bills were left unpaid. If James O'Neil's story is true, he accepted as a gift from his brother all the funds he had to bear his expenses and after a day or two returned to his home, leaving his brother in the hospital wholly destitute. He omitted even to thank his brother for his generosity. He did not return, though the evidence shows that about

the time the deceased left Rochester on his return to Glendive accompanied by his nephew, he sent to deceased a money order for five dollars. Why he did this the evidence does not disclose. Aside from this attention he seems not to have cared what became of his brother. He was present at the burial at Glendive. On the next day the will was opened and read in the presence of plaintiff and the defendant. The defendant expressed dissatisfaction when he ascertained that under its provisions the son of plaintiff received a larger share of the estate than was given to him and his two sisters. He immediately announced his intention to contest the will. The fact that he had the certificates in his possession was mentioned, and though they were referred to as a part of the estate, and though he found fault with the valuation of the real property disposed of by the will, he did not then claim that the certificates had been given to him by his brother, nor did he thereafter, so far as the evidence discloses, claim them until a contest of the will instituted by him had been disposed of. Early in January, 1909, Mr. Hurley, one of counsel for plaintiff, visited Fridell at Rochester, Minnesota, to make inquiry concerning the certificates. In response to an inquiry as to what was said at the time the wallet and watch were delivered to the defendant, Fridell said: ''The day that John O'Neil went to the hospital he asked me for the package of papers and I gave them to John and John handed them over to Jim.'' Answering the question whether the deceased said anything about giving the papers to his brother, he said he did not. Questioned further he said that there was nothing said at that time that led him to think that the deceased intended to make his brother a gift, but that he supposed the papers were delivered for safekeeping only. He further said that he did not hear the deceased say that he expected to die or anything to indicate that he was laboring under apprehension of death. Subsequently, in a letter to the same witness in answer to similar inquiries addressed to him, he said: ''I heard him (deceased) say that they are yours to keep, or words to that effect.'' It appears that the telegram received by the defendant from deceased, summoning him to St. Paul, was the only information he had received

as to his brother's whereabouts for nineteen years. There is nothing in the evidence showing that the deceased had a higher regard for the defendant than for his other kinsmen. The deceased was apparently intelligent and had had considerable business experience. He was able to attend to his business affairs notwithstanding the feeble condition of his health, and was not pressed for time; yet he did not indorse the certificates though he must have known that a transfer of a certificate is usually [4] made by indorsement. While the indorsement was not absolutely essential to the validity of the gift, because a delivery of such an instrument is sufficient to transfer the equitable title (*Ridden* v. *Thrall, supra;* Thornton on Gifts, pp. 229, 242; 20 Cyc. 1202), the omission of this formality was a fact for consideration by the court and jury.

Taking into consideration these circumstances, together with the fact that the defendant was an interested party, and, as appears from the evidence, further that Fridell exhibited a [5] partisan interest in the result of the litigation, it cannot be said that the jury or the trial court arbitrarily disregarded their testimony or that the conclusion reached that the transaction did not amount to a gift, is unreasonable.

If it was not the intention of deceased to make a gift, then as heretofore stated, it is not of moment to inquire what was the cause of his death.

The court entertained the view that the validity of defendant's claim was to be determined according to the law of the state of Minnesota relating to gifts *causa mortis* and instructed the jury accordingly, having ascertained it from reported decisions of the supreme court of that state which were introduced in evidence by counsel for plaintiff. Error is assigned upon the action of the court in this behalf, counsel insisting that though the case is one in equity, the view of the court was fundamentally wrong because, since the gift could not become effective until the death of deceased, and since the death occurred in Montana, the validity of the gift would have to be determined by the law of this state. Counsel also insist that the court erred in admitting in evidence [6] the decisions from the state of Minnesota. The validity of a

gift *causa mortis* is determined by the law of the place where it is made, without reference to the domicile of the donor. (*Emery* v. *Clough,* 63 N. H. 552, 56 Am. Rep. 543, 4 Atl. 796; *Burt* v. *Kimbell,* 5 Port. (Ala.) 137; *Tarlton* v. *Briscoe,* 7 Bibb (Ky.), 73; Thornton on Gifts, sec. 13; 20 Cyc. 1243.) But it is not [7] necessary to inquire whether the court's view was correct or not. The definition of a gift *causa mortis* by the Minnesota court, as stated in the instructions to the jury, is in conformity with the common law, which, as has already been pointed out, is embodied in our own statute. (*Allen* v. *Allen; Varley* v. *Sims, supra.*) Hence the court did not err to the prejudice of the defendant, either by pursuing the method it did in ascertaining the law of Minnesota, or in instructing the jury in accordance with it.

The judgment and order are affirmed.

*Affirmed.*

MR. JUSTICE SMITH and MR. JUSTICE HOLLOWAY concur.

(Submitted September 18, 1911. Decided October 3, 1911.)