SYLVAIN ET AL., RESPONDENTS, *v.* PAGE, APPELLANT.

(No. 6,414.)

(Submitted February 19, 1920.   Decided March 29, 1929.)

[276 Pac. 16.]

Mr. *L. A. Smith* and Mr. *J. A. Poore*, for Appellant, submitted a brief, and argued the cause orally.

*Mr. Joseph P. Vilk, Mr. N. A. Rotering* and *Mr. H. K. Jones,* for Respondents, submitted a brief; *Mr. Vilk* and *Mr. Rotering* argued the cause orally.

428

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is an action brought by the administratrix of the estate of John Page, deceased, with whom joined Florida Sylvain, the daughter of Page, to cancel a deed and bill of sale executed by Page to defendant, then his wife, on April 30, 1920, and to have the defendant declared an involuntary trustee of the property covered by those instruments, as well as other personal property, and for an accounting.

The defendant seasonably requested findings in writing which the court refused to make. It made findings of its own to the effect that the deed and bill of sale were not delivered by Page to defendant, nor was any of the property

therein mentioned delivered or transferred to defendant, but that at the time of his death decedent was not the owner of the household goods, furniture and fixtures in the family residence or the automobile referred to in the complaint; that defendant had possession of property belonging to the estate, of which she was and is an involuntary trustee, and that plaintiffs are entitled to an accounting as prayed for. Thereupon a decree was entered in favor of the plaintiffs, from which the defendant has appealed.

The determinative question is whether the evidence supports the court's findings. This will be discussed under three heads: (1) touching the real estate, (2) the personal property covered by the bill of sale, (3) the personal property not covered by the bill of sale.

1. It is admitted that on April 30, 1920, John Page signed and acknowledged a deed conveying to Lulu Page, his wife, the defendant, certain town lots in Butte and Missoula. The consideration was one dollar and love and affection. The real property included the home occupied by Page and his wife, which already stood in their joint names, and some apartments in Butte. And at the same time Page signed and acknowledged a bill of sale whereby he purported to grant, bargain, sell and convey to the defendant, "all household goods, furniture and fixtures and furnishings of every kind and nature, also all jewelry, and diamonds owned by me, together with all my interest in and to that certain Cole-eight automobile and all parts and accessories thereunto belonging. And any and all other personal property of whatsoever nature or description owned by or belonging to me." For an understanding of what follows some explanations are necessary.

Florida Sylvain, plaintiff, is Page's daughter by his first wife. Defendant was Page's second wife. That between Mrs. Sylvain and her stepmother there was no love lost is apparent. Mrs. Sylvain had not lived with her father for a long time. She had been married twenty-one years at the time of the trial. The relations between Mrs. Sylvain and her

father were cordial. He visited her at her home frequently, every week or so.

John Page and defendant were married in 1915. For the first six weeks they lived in Butte and then moved to the brickyard of the Butte Sewer, Pipe & Tile Company, where Page was foreman. They lived there two years, after which they made their home in the city. Having little faith in banks, Page placed a hollow tile, with cover, in the ground in a corner of the warehouse which adjoins the office at the brickyard. The tile was covered with dirt, and barrels were placed in the corner where it was. In it Page, who was a frugal man, hid his savings, and defendant, so she testified, made use of it for a like purpose. As foreman, Page received $5.00 and $5.50 per day, depending upon the character of work. Page died on June 22, 1926, and was buried on the third day following.

Plaintiffs' case rests mainly upon admissions said to have been made by defendant to neighbor women. Four of these, none friendy with defendant at the time of the trial, testified for plaintiffs. Each related conversations said to have been carried on with defendant. According to these witnesses, within a few days after the funeral defendant said that with her son and his wife she visited the brickyard on the night following the death of Page. There at midnight she and her son hunted for and found the cache. According to Mrs. Hudson, "she said she found papers, money and jewelry." As to the amount of money defendant said, "I don't have to worry any more or go without anything." "She said she got the diamond ring and watch and trinkets; about $1,500 worth of jewelry." "She said, 'I took the papers to my lawyer and when he saw them and saw they weren't recorded he told me to have them recorded.' " That she had to work fast at the brickyard, for if the Sylvains had got there first she would not have got a thing, and they would have thrown her out; that "she had put one over on them." This witness also testified that some three years prior to Page's death defendant came to witness' house with deeds; on that occasion

defendant told of having broken open a cement vault in the Page home from which she took Page's diamond ring, the papers and money; that when Page came home they had a fuss and a scuffle in which he tried to get the ring, and during the scuffle defendant fell; she then threw the ring on the table and fled to the house of the witness. The deeds were not in an envelope, they were tied with a string or rubber band. The deeds were left with witness who did not examine them. She tossed them on to a cushion where they remained 24 or 48 hours. Later, witness testified, Mrs. Page said she gave everything back to Mr. Page and he gave her the money, $300.

Mrs. Cassman said defendant told her of the trip to the brickyard where she got considerable money and jewelry; also papers. "She said 'when I got the papers I found out they were not recorded so we rushed up and had them recorded.'" She said she "put one over on the Sylvains." This witness also testified that defendant told her of breaking the vault in the basement from which she got the ring and $300.

A witness, Mrs. Lenk, who was about to leave the state, testified by deposition. She had rented a portion of the Page home during the latter part of August and lived there until early December. Witness said defendant told her of the trip to the brickyard, the discovery of the cache and of the deeds. "She took them down to a lawyer, and she said they had not been recorded and she took them to the court house that very day at noon and had them recorded." According to the witness the defendant told her how the deeds came to be made. The circumstances were that on one evening after defendant had been thinking over the matter all day, she compelled her husband to dress and to go with her to a lawyer's office. Witness testified: "I think she said about 7 o'clock at night and she said, 'we made out the deeds,' and she said he kept it in his safe at home, and she broke open the safe and got them and then he took them away from her and out to the brickyard." That if she had not got to the brickyard there wouldn't have been anything left; but even if Page had changed the deeds and made over the property to the Sylvains,

she would have had fifteen or sixteen thousand dollars to live on, for she found the ring and watch and chain and fifteen or sixteen thousand dollars in the cache. The witness testified also that defendant said when she was getting Page ready to go to the hospital she said to him, "Papa, you are an awful sick man, if anything happens to you where will I find things?" and he replied, "Si knows everything; you go to him." This witness was voluble, testified at great length and exhibited a strong enmity against the defendant. She suspected the defendant of having taken some of witness' personal belongings. Mrs. Lenk iterated and reiterated that she never told anybody anything respecting the testimony she would give in the case; she never had any conversation with anyone about the facts in the case. She volunteered as a witness for Mr. Vilk but did not discuss the facts with him before taking the stand.

Mrs. McCoy, by deposition, testified that defendant stayed at her house the night of the funeral. Witness and defendant conversed about the trip to the brickyard. Witness asked defendant, "Well, did you get the ring?" Defendant said, "Yes, I got everything, but I sweat blood before we got it. I thought George would never find the place where Mr. Page had it hid." "I beat the Sylvains to it; I got there before they did." In the cache she found the ring and papers and everything. Witness saw the ring at one time; Mr. Page had it on. Defendant told her that it belonged to Mr. Page.

Ernest LaPalm, who lived at the brickyard, told of defendant's coming there at midnight on the night of the day Page died, saying she wanted some papers of her husband's. She explained that she did not need his assistance as she had "the permission and keys from Mr. Griffith to go in." Mr. Griffith, called Si, was the manager of the brickyard.

It was shown that insurance upon the buildings was carried in the name of John Page, except the home property, which was carried in the names of John Page and Lulu Page.

At one time after the execution of the deed the defendant signed the name of John Page to an assessment blank which contained a description of the real property.

434

The testimony is voluminous; the foregoing is but an abstract of salient points.

The defendant, testifying in her own behalf, admitted that she had told Mrs. Hudson, Mrs. Cassman and Mrs. McCoy that she had gone to the cache at the brickyard and had got money therefrom; but denied that she had ever had any conversation whatever upon the subject with Mrs. Lenk; denied that she ever told them, or anyone else, that she obtained any papers from the cache, or any jewelry except a little stickpin. She knew exactly where the cache was, had used it frequently herself. The money she took from the cache, $930, she said was her own; she had deposited it there herself. She had, some years before, told Mrs. Hudson of a difficulty between her husband and herself over breaking the lock upon the little cement vault in the cellar of her home, but denied that she ever had taken any papers to Mrs. Hudson's. Except for the explanations above noted, defendant in effect denied categorically the entire testimony of Mesdames Hudson, Cassman, Lenk and McCoy which we have set forth above. She explained that she did not put the deed on record because Mr. Page did not want it known that he had conveyed the property.

Defendant testified that a little before midnight on the day her husband passed away she, with her son and his wife, went to the brickyard. She woke up the watchman, telling him she wanted to get some things of hers and that she had a key to the office and permission from Griffith to go in. With a key which she obtained from her husband's pocket she opened the office and proceeded thence into the warehouse. She went, as she testified, directly to the cache, directing her son to remove a barrel which stood over it and to dig. Her son corroborated this testimony. To the question, "Did she have any difficulty in finding the place?" he answered, "No sir, not a bit." Ellen Dunn testified that after they entered the warehouse defendant said to her son, "You move the barrel, George, and dig there." In answer to the question, "Did your mother-in-law and husband have any difficulty in finding the cache?" Mrs. Dunn said, "No, sir, not a bit of

trouble. She knew where it was." All three testified that Dunn, after uncovering the cache, took from it a little tin box in which was a leather box containing $930 in bills and a cheap stickpin which was stuck in the lid of the box. There was no other jewelry. No papers of any kind. Upon recovering the cache the party returned to the Page home.

Lewis A. Smith, an attorney and counselor, a resident of Butte for thirty-five years, testified that Mr. and Mrs. Page came to his office in the Owsley Block in Butte on April 30, 1920. Mr. Page said he desired to convey his property, real and personal, descriptions being given, to Mrs. Page. The Pages were told to return later on in the day, when the deed and bill of sale would be ready for signature. When they returned, Mr. Page signed the papers, acknowledging each before Mr. Smith as notary public. Mr. Page then, in the presence of Smith, delivered deed and bill of sale to Mrs. Page. She asked Smith if she should record the documents and he told her she could do so at any time, but cautioned her against losing them. Smith testified: "She asked me then if I would keep them for her and I told her I would, and I sat down at the typewriter and took a long envelope, a number ten size, and wrote her name on the envelope and put this bill of sale and deed in the envelope and put them in my safe in their presence. By 'their,' I mean John Page and Lulu Page."

The papers remained in the safe for over two years when Mrs. Page called for them. She said she had seen in the newspaper that Mr. Smith was going abroad and felt that she wanted the papers "in case anything happened" to Smith. He took the envelope out of the safe, opened it, showed Mrs. Page that the deed and bill of sale were still there, and handed them to her. Smith did not see the papers again until the twenty-third day of June, 1926, when Mrs. Page and her son, George Dunn, called at his office. Mrs. Page then told Smith that her husband had died and asked him to record the deed for her, which he did. The papers were then in the same envelope which Smith had prepared for their reception originally. Smith's testimony was corroborated in every respect

by the defendant. She also testified that after she saw Mr. Smith was going away she called at his office, received the deed and bill of sale, which she took home and placed in her trunk where it remained until after Mr. Page's death. Ellen Dunn testified that she saw Mrs. Page take an envelope, containing the deed and bill of sale, out of a trunk in the Page home, and that immediately thereafter Mrs. Page and George Dunn went uptown. George Dunn testified that he went with his mother to Mr. Smith's office on the morning of June 23d, 1926, and saw her hand to Mr. Smith "the original envelope" in which were the deed and bill of sale. The papers were taken from the envelope with the suggestion that they had not been recorded and Smith was requested to take care of them.

The testimony of Smith that Page, after signing and acknowledging the deed, gave it to his wife, was not contradicted. Neither was the testimony of Ellen and George Dunn. The only contradiction in Smith's entire testimony related to his personal possession of the papers after they were given by Page to his wife. Upon cross-examination Smith was asked by Mr. Vilk if on June 24, 1926, he had not stated in the presence of Vilk and Mr. Sylvain, husband of the plaintiff Sylvain, that he had drawn a deed and bill of sale for Page about six years ago and had forgotten all about them until the day before, when Mrs. Page appeared and demanded the papers. Smith answered in the negative. Question by Mr. Vilk: "You did not tell me those papers had been in your safe from the date of execution until you delivered them to her on the 23rd of June, 1926?" A. "I told you those papers were in the safe until I delivered them to Mrs. Page, but I did not tell you I delivered them to her the previous day."

Mr. Vilk, testifying, said he and Sylvain, on June 24, 1926, called upon Smith who in response to questions said he had no recollection of the transaction until Mrs. Page came to his office the day before and demanded the papers: "He told me," said Vilk, "that when Mr. Page signed that document, the deed and bill of sale, he handed those papers to Mrs. Page and that she asked Mr. Smith to place them in an envelope and

keep them in the safe for her and he said he had forgotten that during the period of six years he had those papers in the safe." Sylvain corroborated Vilk. Smith, taking the stand, said the testimony of Vilk and Sylvain was true in part only. He had, he said, told Vilk he had drawn the deed and bill of sale and had had the papers in his safe; did not recall that he had said how long they remained there; he did not tell Vilk he had forgotten about the papers or that they were in his safe until the day before; he did tell him he had delivered the papers to Mrs. Page.

An analysis of the conflicting testimony, Vilk and Sylvain on the one side and Smith on the other, it is seen, relates only to the length of time Smith had possession of the papers, and whether he had forgotten having them. It does not disturb nor reflect upon Smith's testimony upon the vital point: the delivery of the papers by Page to his wife.

We thus have direct and positive testimony as to the delivery of the deed by Page to the defendant, and but indirect ▉ testimony tending to show that it was not delivered. It would make no difference if, after delivering the deed to his wife, Page had come into possession of it and thereafter retained it. "Redelivering a grant of real property to the grantor, or canceling it, does not operate to transfer the title." (Sec. 6847, Rev. Codes 1921.) Even on this phase of the case there was direct testimony that upon the death of Page the deed was not in his possession, not in the cache, and but indirect testimony tending to show that it was.

Direct evidence is defined by our statute to be "that which ▉ proves the fact in dispute directly, without an inference or presumption, and which in itself, if true, conclusively establishes that fact. For example, if the fact in dispute be an agreement, the evidence of a witness who was present and witnessed the making of it is direct" (sec. 10496, Rev. Codes 1921); while "indirect evidence is that which tends to establish the fact in dispute by proving another, and which, though true, does not of itself conclusively establish that fact, but which affords an inference or presumption of its existence.

For example, a witness proves an admission of the party to the fact in dispute. This proves a fact from which the fact in dispute is inferred." (Sec. 10497, Id.)

While a party's act, declaration, or omission is evidence against him (sec. 10531, subd. 2, Id.), the rule is that evidence of the oral admissions of a party ought to be viewed with caution. (Sec. 10672, Id.; *McCrimmon* v. *Murray*, 43 Mont. 457, 117 Pac. 73.) This rule is based upon the experience of mankind.

Dean Wigmore says there is a general distrust of testimony reporting any extrajudicial oral statements alleged to have been made, including a party's admissions. (Wigmore on Evidence, sec. 1056.) An admission, he says, is nothing but a piece of evidence, and is "to be distinguished from those statements of the party which become in themselves the foundation of independent rights for other persons, by virtue of some doctrine of substantive law,—in other words, from binding estoppels, warranties, and representations." (Id., sec. 1057.)

In Jones on Evidence, 2d ed., section 1070, it is said that "Verbal admissions should be received with caution and subjected to careful scrutiny, as no class of evidence is more subject to error or abuse. Witnesses having the best motives are generally unable to state the exact language of an admission, and are liable, by omission or change of words, to convey a false impression of the language used. Furthermore, no other class of testimony affords such temptations or opportunities for unscrupulous witnesses to distort the facts or to commit open perjury, as it is often impossible to contradict their testimony at all, or at least by any other witness than the party himself. These and similar considerations have repeatedly led the courts to declare in substance that admissions are evidence of low grade—the weakest and most unsatisfactory form of evidence." (And see Greenleaf on Evidence, 14th ed., sec. 200.)

The decedent did not owe any debts. No creditor is complaining. There is no allegation of fraud or deceit lodged against defendant. The burden was upon the plaintiffs to

prove nondelivery of the deed. The statute declares "a grant duly executed is presumed to have been delivered at its date." (Sec. 6844, Rev. Codes 1921.)

Without further discussion it is enough to say that upon ██ the rules of law, and upon an analysis of all the testimony in connection with the facts and circumstances shown, the weight of the evidence preponderates heavily in favor of the delivery of the deed by Page to the defendant, and the court's finding to the contrary cannot be sustained. "The rule that the trial court may not disregard uncontradicted credible evidence is fundamental." (*Giebler* v. *Giebler,* 69 Mont. 347, 222 Pac. 436; *Haddox* v. *Northern Pac. Ry. Co.,* 43 Mont. 8, 113 Pac. 1119.)

2. For the reasons foregoing it must be held that the bill of sale was delivered at its date also. A transfer in writing is called a grant, or conveyance, or bill of sale. The term "grant" includes all these instruments unless it is specially applied to real property. (Sec. 6842, Rev. Codes 1921.) The delivery of a grant is necessarily absolute; it cannot be delivered conditionally. (Id., 6845.) "A transfer vests in the transferee all the actual title to the thing transferred which the transferer then has, unless a different intention is expressed or is necessarily implied." (Id., 6856.)

Plaintiffs say there was no consideration for the transfer. There being a written instrument, consideration is presumed (Id., 7512), and no evidence was introduced by plaintiffs on ██ that issue. But let us suppose there was none. A gift is a transfer of personal property, made voluntarily and without consideration. (Id., 6882.) "To constitute a gift *inter vivos,* within the statute, the donor must voluntarily deliver the subject of the gift to the donee with the present intention to vest the legal title in the donee, who must accept it. The essential elements are therefore: the delivery, the accompanying intent, and acceptance by the donee. Such a gift is made without condition, and becomes at once irrevocable." (*O'Neil* v. *O'Neil,* 43 Mont. 505, Ann. Cas. 1912C, 268, 117 Pac. 889; *Fender* v. *Foust,* 82 Mont. 73, 265 Pac. 15.) "A gift, other

than in view of death, cannot be revoked by the giver." (Sec. 6884, Rev. Codes 1921.)

Under identical statutes the supreme court of California has held "that as between the donor and the donee it is not necessary to the validity of a gift *inter vivos,* if made by a written instrument transferring the title to the donee, that the possession of the thing given be passed to the donee." (*Burkett* v. *Doty,* 176 Cal. 89, 167 Pac. 518; *Driscoll* v. *Driscoll,* 143 Cal. 528, 77 Pac. 471; *Francoeur* v. *Beatty,* 170 Cal. 740, 151 Pac. 123; *Stone* v. *Greene,* 181 Cal. 569, 185 Pac. 670.) While a verbal gift is not valid unless there is actual or symbolical delivery to the donee of the thing given (sec. 6883, Rev. Codes 1921) this rule has no application when the gift is effected by an instrument in writing. (*Francoeur* v. *Beatty,* supra; *Driscoll* v. *Driscoll,* supra.) A sale of personal property is good between the parties whether possession be delivered or not; want of delivery renders it void only as to creditors and subsequent bona fide purchasers and encumbrancers. (*O. W. Perry Co.* v. *Mullen,* 81 Mont. 482, 56 A. L. R. 514, 263 Pac. 976.) The same is true with respect to a gift from husband to wife. (*Driscoll* v. *Driscoll,* supra; *Francoeur* v. *Beatty,* supra.)

In this case there are neither creditors, subsequent purchasers nor encumbrancers. The plaintiffs stand in the shoes of the decedent. What would be good as to him must be held valid as to them. In addition, defendant testified that after her husband delivered the bill of sale to her he handed to her all the jewelry he possessed,—the diamond ring, a pair of cuff buttons, and a watch and chain. There is no testimony to the contrary save such inferences as may be drawn from the alleged admissions of defendant, which, in this case, are not sufficient to enable the plaintiffs to prevail. Conceding that the decedent had possession of the jewelry at times after the bill of sale was delivered, the result is the same. (*Driscoll* v. *Driscoll,* supra; *Burkett* v. *Doty,* supra.)

Counsel for plaintiffs stress the improbability of Page's intention practically to disinherit his only daughter, of

whom he was fond. The motives which impelled him to make, execute and deliver to his wife the deed and bill of sale are not for us to explain; he did so. While his action may appear strange, he was privileged to do as he pleased with his own property, if in so doing he did not interfere with the rights of another.

3. The court's findings with respect to the money taken from the cache by defendant must stand. This under the proof was $930. We regard the alleged admission of defendant that she obtained "fifteen or sixteen thousand dollars" from that source absurd. It must be remembered that the testimony shows that after the deed was delivered defendant collected the rents from the real property, and decedent had no other source of income than from his wages. It is not believable that he had any such sum of money there. Nor is it believable that the defendant deposited any such sum there, if she deposited there at all. The rentals received were not much more than sufficient to defray the family expenses. Moreover, she had a bank account, although her deposits there were small. The evidence discloses that in 1921 husband and wife placed a mortgage upon what defendant described as "my flat" to obtain $1,800 with which to make repairs, and to purchase an automobile, and it took four years to pay off that indebtedness. Defendant explained her unseemly haste in procuring the money at the brickyard by saying that she had only $10 at the house, and she had to have money to pay for the mass, and some clothes to wear at the funeral.

While defendant offered explanations respecting her conversations with Mesdames Hudson, Cassman and McCoy, the fact remains that she did talk with them in a boastful manner, and in the conversations exhibited a malignant exultation over the discomfiture of her stepdaughter.

The judgment is reversed with directions to the district court of Silver Bow county to enter judgment for defendant for the real estate described in the deed and for the personal property comprehended in the bill of sale. With respect to all

other property of the decedent, including the money obtained from the cache, the plaintiffs are entitled to an accounting, and it is so ordered. The defendant shall recover two-thirds of her costs on this appeal.

ASSOCIATE JUSTICES MATTHEWS, GALEN, FORD and ANGSTMAN concur.