No. 81-234

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

EXETER EXPLORATION COMPANY et al.,

Plaintiffs and Respondents,

vs.

J. W. FITZPATRICK, et al.,

Defendants and Appellants.

Appeal from: District Court of the Sixteenth Judicial District,
In and for the County of Rosebud
Honorable A. B. Martin, Judge presiding.

Counsel of Record:

For Appellants:

Moulton, Bellingham, Longo and Matther, Billings,
Montana
William H. Bellingham argued, Billings, Montana

For Respondents:

Sandall and Cavan, Billings, Montana
James L. Sandall argued, Billings, Montana
McNamer, Thompson & Cashmore, Billings, Montana

For Amicus Curiae:

Walter W. Sanders, Houston, Texas

Submitted: September 9, 1982

Decided: January 20, 1983

Filed: JAN 20 1983

_____
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Defendants, J. W. Fitzpatrick, et al. appeal from a judgment of the Rosebud County District Court quieting title to the working interest in an oil and gas lease in favor of plaintiffs, Exeter, et al. and defendant, Youngblood. The dispute stems from an assignment made in 1969 by J. W. Fitzpatrick of certain portions of his interest in an oil and gas lease. The assignment was part of a plan of Fitzpatrick's to liquidate a family corporation. The assignees were himself, his wife and four trusts which he had established for his children. Exeter brought this quiet title action to determine whether the four trusts own a working interest or an overriding royalty interest in the lease. The working interest claimed by the trusts is more valuable: the amount due the four Fitzpatrick trusts as working interest owners on production through April 1980 would be $202,709.86; the amount which would be due them as owners of an overriding royalty interest for the same period would be $18,084.49. The trial court ruled that the trusts own only overriding royalty interests, and also ruled that the trusts were not entitled to interest on the amounts withheld pending the outcome of litigation. We reverse and remand for entry of judgment in favor of J. W. Fitzpatrick, et al.

Fitzpatrick, et al. raise four issues. First they contend that the 1969 assignment to the trusts was a gift and that the trial court erred in ruling that the gift failed for lack of delivery and lack of acceptance, and because J. W. Fitzpatrick retained dominion and control over the working interest. Second, they argue that the trial court erred in ruling that even if the gift was valid, nonetheless, J. Lee Youngblood had a right to notice in writing of that assignment and that no such notice was given. They argue that Youngblood had constructive notice of the assignment, which was sufficient. Third,

2

they argue that the trial court erred in ruling that in any event Youngblood had a right to acquire the working interest by specifically enforcing a preferential right of purchase against the Fitzpatrick trusts. They contend that the preferential purchase right is not applicable to a gratuitous transfer to a family member and that J. Lee Youngblood waited too long to exercise the right. The fourth and final issue does not go to the merits of the lawsuit, rather the four Fitzpatrick trusts claim that regardless of the nature of their ownership, they are entitled to interest on any money owed to them which has been held in suspense pending the outcome of this suit.

The oil and gas lease is on land in Rosebud County. In 1968, the working interest in the lease was co-owned by four parties: J. W. Fitzpatrick, L. S. Youngblood, Natural Gas and Oil Company, and Continental Oil Company. The exact percentage owned by each party has no bearing on this appeal. The interests are subject to the terms of an operating agreement signed by the parties on April 29, 1954, and recorded. The agreement included a clause giving each party a preferential right to purchase the working interest of any other party.

On September 27, 1968, J. W. Fitzpatrick created four trusts at the Wyoming National Bank of Casper, one for each of his four children. He conveyed various assets to the trusts as part of a plan to liquidate his business holdings for estate planning purposes.

The disputed assignment occurred on June 22, 1969 when J. W. Fitzpatrick divided his working interest in the lease and assigned approximately one-third to his wife, approximately one-third in equal shares to the four trusts, and reserved one-third to himself. This lease was only one of several items J. W. Fitzpatrick included in the 1969 assignment. The trial court held only that the assignment to

3

the trusts of the working interest in that particular lease was invalid.

In 1967, J. Lee Youngblood acquired a working interest in the lease from his brother, L. S. Youngblood, who had been one of the original parties to the 1954 operating agreement. J. Lee Youngblood sought to acquire the rest of the outstanding working interests. On May 26, 1972, J. W. Fitzpatrick, Natural Gas and Oil Company and Continental Oil Company all signed a quitclaim assignment of whatever working interest they had to J. Lee Youngblood. After obtaining these assignments, J. Lee Youngblood believed that he owned 100 percent of the working interest in the lease. He then contracted with Exeter Exploration Company et al. to explore and develop oil and gas wells on the land. Ownership or control of 100 percent of the working interest in an oil and gas lease is necessary as a basis for exploration and development. Development was successful and the lands became productive in 1972.

In this suit, Youngblood contends that by the 1972 assignment, he acquired all of the working interest which J. W. Fitzpatrick had ever owned in the lease. The Fitzpatrick trusts on the other hand contend that they have a superior claim to the portion of the working interest which had been assigned to them in 1969. Therefore the trusts argue that by the 1972 assignment Youngblood acquired only the one-third working interest which J. W. Fitzpatrick had reserved to himself in the 1969 assignment.

In 1975, Youngblood began to doubt whether he had acquired all of J. W. Fitzpatrick's original working interest. Therefore, at Youngblood's insistence, J. W. Fitzpatrick and his wife both signed letters to ratify that Youngblood had acquired all of their working interest in 1972. However, the four Fitzpatrick children as beneficiaries of the trusts which J. W. Fitzpatrick created in 1968,

4

refused a request from Youngblood to sign similar letters indicating that they had no claim to the working interest in the lease.

The first question is, of course, whether the 1969 assignment to the trusts was valid. If so, Youngblood argues that he nonetheless had a right to exercise the preferential purchase right contained in the 1954 operating agreement. This agreement gave each party a preferential right to purchase the working interest of another party upon meeting the terms offered a purchaser. J. W. Fitzpatrick's assignments to his childrens' trusts were gifts. In effect, Youngblood claims that the preferential purchase clause requires that before J. W. Fitzpatrick could give his working interest as a gift to his children, he first should have offered it as a gift to Youngblood.

The trial court concluded that the 1969 assignment was invalid for the failure of delivery, failure of acceptance and for retention of dominion and control over the working interest by J. W. Fitzpatrick. We hold that the 1969 assignment to the trusts was valid; that delivery was sufficient, that the trusts accepted the assignment and that J. W. Fitzpatrick's involvement with the working interest did not constitute an exercise of dominion and control over the working interest.

DELIVERY AND ACCEPTANCE

In 1929, we held that actual or symbolic delivery is not necessary to complete a gift effectuated by an instrument in writing. Sylvain, et al. v. Page (1929), 84 Mont. 424, 276 P. 16. J. W. Fitzpatrick executed and recorded the 1969 assignment. The trial court found that J. W. Fitzpatrick's intent in making the assignment was to transfer income from oil and gas production to his wife and to the four trusts for his children. We therefore conclude that delivery was complete.

5

We have no doubt, furthermore, that the trusts accepted the 1969 assignment. Acceptance is presumed if a gratuitous assignment is beneficial to the assignee. 6 Am.Jur.2d Assignments § 93. The trial court noted that there was no production on the land in 1969 and the assignment of the lease was therefore not beneficial to the trusts. However, the 1969 assignment included other property, most of which generated income. In fact, the record shows that this lease was the only nonproducing lease included in the assignment, and the only one which did not generate income. It cannot be doubted that the net effect of the entire assignment was beneficial to the trusts. As such, acceptance of the trusts is presumed.

DOMINION AND CONTROL

The trial court concluded that J. W. Fitzpatrick continued to exercise dominion and control over the working interest. The trial court relied on two factors in reaching this conclusion. First, for the years 1970-71 and 1971-72, J. W. Fitzpatrick paid the lease rentals on the subject lease. Second, in November 1969, J. W. Fitzpatrick executed documents circulated by Continental Oil Company which showed him to be the owner of the working interest in various leases which had been included in the 1969 assignments to the trusts. This evidence is insufficient to support a conclusion that J. W. Fitzpatrick retained dominion and control over the working interests assigned to the trusts.

The total amount J. W. Fitzpatrick paid for the lease rentals for both years was less than $50, yet the value of the disputed working interest was over $200,000. When compared with the value of the working interest, the lease rental payment is inconsequential. Although J. W. Fitzpatrick was not reimbursed, the evidence suggests that the payments might have been inadvertent. J. W. Fitzpatrick had extensive oil and gas holdings and in 1969 had retained a portion of the working interest in the lease. His signature on the documents

6

circulated by Continental Oil Company came only a few months after the 1969 assignment. These two isolated incidents, are insufficient to show the exercise of dominion and control, particularly in view of the fact that although exploration and development of the oil and gas was taking place, nothing in the record suggests that J. W. Fitzpatrick played any role in the development or production under the lease. We therefore hold that there is not sufficient evidence that J. W. Fitzpatrick retained dominion and control over the working interests which he had assigned to the trusts.

PREFERENTIAL PURCHASE

We turn next to Youngblood's alternative claim that even if the 1969 assignment was valid, he is entitled to enforce the preferential purchase clause in the 1954 operating agreement. That clause provides:

> "In the event any party hereto desires to <u>sell or assign</u> any of its or his interest . . . such party shall promptly communicate by notice in writing to the other parties . . . the terms and conditions upon which it or he is willing to <u>transfer</u> and <u>assign</u> the interests involved and the other parties, or any of them, shall, for a period of ten (10) days after receipt of such notice, have an <u>option</u> to <u>purchase</u> such interest on the terms and conditions contained in such notice . . ." (Emphasis added.)

The Fitzpatrick trusts argue that Youngblood's right to notice was satisfied by constructive notice when J. W. Fitzpatrick recorded the 1969 assignment. But Youngblood urges a literal interpretation of the preferential purchase clause and contends that he was entitled to notice in writing. We agree with Youngblood that constructive notice does not satisfy the requirement of notice in writing. However, Youngblood had actual knowledge of the assignment at least 15 months before he notified J. W. Fitzpatrick and the four Fitzpatrick trusts that he intended to exercise his preferential purchase right. The trial court found, and it is not disputed, that Youngblood had actual knowledge of the 1969 assignment in December

7

1975 when he was shown a copy of the assignment by his employee, Lloyd Terry. We note that the disputed 1969 assignment to the trusts was drafted by the same Lloyd Terry, who was also at that time an employee of J. Lee Youngblood.

The preferential purchase clause is not open-ended; rather, a party desiring to exercise the right must give notice of his intent within ten days. Nonetheless, Youngblood waited until March 14, 1977, some 15 months later, to notify J. W. Fitzpatrick and the four Fitzpatrick trusts of his intent to exercise his preferential right. Youngblood has shown no excuse for waiting 15 months to exercise the preferential purchase right.

Nor are we satisfied that the parties clearly intended the preferential purchase clause to apply to a transfer without consideration between family members. The Fitzpatrick trusts argued at the trial level and argue here that the clause does not clearly specify the events which will trigger the preferential right. The trial court failed to address this issue. The words used in the clause include "sell or assign," "transfer and assign," or simply "assign." Interchangeable use of the words creates ambiguity as to the parties' intent.

Section 28-3-501, MCA, provides that unless the parties intend otherwise, words of a contract are to be understood in their ordinary and popular sense rather than according to their technical legal meaning. Because the words setting forth the events which trigger the preferential purchase right are used interchangeably, we do not believe the parties intended the words to be understood in the technical legal sense. The preferential right is referred to as a preferential purchase right; the right gives a party ". . . an option to purchase . . ." (Emphasis added.) The word purchase leads us to believe that the parties intended the preferential purchase clause to apply only to a transfer for consideration. The

8

clause was not intended to prevent a party from transferring his interest to members of his family as a gift unless he first offered it as a gift to other parties to the 1954 operating agreement.

Other evidence indicates an intent to exclude transfers to family members. J. Lee Youngblood acquired his interest in the basic oil and gas lease by assignment from his brother's estate in 1967. Neither the estate nor J. Lee Youngblood notified the other working interest owners of that transaction so that they might exercise their preferential purchase right as Youngblood seeks to exercise his in this case. Strong policy reasons exist in favor of a rule that purchase options should be strictly construed against the holder of the option. 11 Rocky Mtn. Mineral Law Institute 35 (1966), Preferential Purchase Rights.

We conclude that Youngblood has no valid claim to the working interest held by the trusts. The fact that in 1975, J. W. Fitzpatrick and his wife ratified that the 1972 assignment transferred their working interest to Youngblood does not adversely affect the interests of the four Fitzpatrick trusts. J. W. Fitzpatrick and his wife had both retained portions of the working interest in the 1969 assignment, which they were free to transfer. The 1972 assignment to Youngblood did not transfer a specific interest but merely quitclaimed whatever interest J. W. Fitzpatrick had. J. W. Fitzpatrick made no representation in the 1972 assignment to Youngblood which would make it incompatible with the 1969 assignment to his childrens' trusts.

Neither J. W. Fitzpatrick nor his wife received consideration from Youngblood for the 1972 assignment or for the ratifications in 1975. As a result of the ratifications, Youngblood owns the working interests of J. W. Fitzpatrick and of Fitzpatrick's wife for which Youngblood paid nothing. But we cannot agree that Youngblood also

9

has a right to the working interests of the four Fitzpatrick trusts and to pay nothing for them.

INTEREST

The trusts have not received any of the proceeds from production under the lease. Payment has been suspended pending outcome of this suit. The trial court held that no interest is due on amounts payable to the four Fitzpatrick trusts. We find no evidence of a written agreement among the parties disallowing interest on suspended payments. We hold that interest is payable at the legal rate on all amounts due the four Fitzpatrick trusts as working interest owners. The suspended payments never did and could not have belonged to any other than the trusts. Equitable principles require the payment of interest on those amounts. See: Sterling v. Marathon Oil Co. (Kan. 1978), 576 P.2d 635; Phillips Petroleum Co. v. Stahl Petroleum Co. (Tex. 1978), 569 S.W.2d 480; Shutts v. Phillips Petroleum Co. (Kan. 1977), 567 P.2d 1292; Phillips Petroleum Co. v. Adams (5th Cir. 1975), 513 F.2d 355.

We reverse and direct the District Court to enter judgment for the appellants in accordance with this opinion.

_____
                    Justice

We Concur:

_____

_____

_____

10

_____

_____
Justices

_____
Hon. Robert C. Sykes,
District Judge, Sitting
for Mr. Chief Justice
Frank I. Haswell

11